In re John Richard SULLIVAN, Debtor.

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver of Silverado Banking, Savings and Loan Association; Resolution Trust Corporation as Receiver of Sandia Federal Savings Association; and The Sullivan Plan Committee, Plaintiffs,

v.

John Richard SULLIVAN, Defendant.

Bankruptcy No. 391–32099–HCA–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Feb. 9, 1997.

Robert G. Richardson, Hutcheson & Grundy, L.L.P., Kenneth Stohner, Jr., Jackson & Walker, L.L.P., Dallas, TX, for Plaintiffs.

Tom Thomas, Thomas, Sheehan & Culp, L.L.P., Dallas, TX, for Defendant.

## MEMORANDUM OPINION [1]

HAROLD C. ABRAMSON, Bankruptcy Judge.

The above-captioned adversary proceeding ("Adversary") is a proceeding brought to deny the bankruptcy discharge of John R. Sullivan ("Sullivan" or "Debtor"). The Adversary has been fully tried before the Court on nonconsecutive days, as permitted by the Court's docket, over a period of nearly one year.

This Court has jurisdiction over the Adversary as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), –(J), and –(O).

## OVERVIEW

This lawsuit was brought to determine whether, pursuant to the Debtor's confirmed Chapter 11 plan, the Debtor will receive a discharge. For the reasons described under "Procedural Background" below, the lawsuit has been reduced to the Court's determination under 11 U.S.C. § 727(a)(2), –(4), and –(5). The Court finds that the Plaintiffs have shown by a preponderance of the evidence that Sullivan, with the help of various professionals, used an elaborate network of family trusts to conceal considerable assets from creditors and preserve them for himself. The Court also finds that Sullivan intentionally omitted items from, and misrepresented other items on, his bankruptcy schedules. For those reasons, as more fully discussed herein, the Court finds that Sullivan's discharge must be denied.

## PROCEDURAL BACKGROUND

Sullivan filed his individual Chapter 11 petition on February 1, 1991 ("Filing Date"). A.M. Mancuso later was appointed as Chapter 11 trustee.

On February 13, 1992, the Federal Deposit Insurance Corporation ("FDIC") and the Resolution Trust Corporation ("RTC"), acting as the respective receivers for two failed lending institutions, filed this Adversary.[2] Their complaint alleged that, by virtue of 11 U.S.C. §§ 1141 and 727(a)(2), –(3), -(4), and -(5), Sullivan's discharge should be denied.[3]

On March 13, 1992, this Court confirmed the Trustee's Second Amended Plan of Reor-

---

1. The trial on this matter was concluded in July 1994. On October 13, 1994, the Debtor filed a Motion for Recusal and for New Trial. The Court orally denied this motion on the record at a hearing on another matter in the Sullivan bankruptcy case on January 5, 1995. The Court wants to make it clear to the parties that the filing of the Motion for Recusal had no impact on this Memorandum Opinion, which was formulated after the conclusion of the trial. The Court has been preparing and reviewing this opinion over the past several months.

2. The Sullivan Plan Committee, comprised of certain creditors classified in the trustee's confirmed plan of reorganization, later intervened as a party plaintiff.

3. The pertinent portions of 11 U.S.C. § 1141 are subsection (d)(1) ("Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan ... discharges the debtor from any debt that

arose before the date of such confirmation....") and subsection (d)(3), which reads:

The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

The pertinent portions of 11 U.S.C. § 727 are:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

ganization as modified by the Trustee's Revised Second Amended Modifications ("Plan"). Section 9.1 of the Plan states: "The Debtor shall not receive a discharge unless the Debtor prevails under all Section 727 proceedings."

Sullivan moved for summary judgment in this Adversary on the ground that a Chapter 11 debtor's discharge could only be denied under § 1141(d)(3) and that, as a matter of law, the Plaintiffs could not prove two of the three essential elements of § 1141(d)(3)—i.e., that the Plan provided for the liquidation of substantially all of the property of Sullivan's estate and that Sullivan would not engage in business after consummation of the Plan. The Court held, in a Memorandum Opinion entered April 1, 1993, as follows:

> The Court construes Section 9.1 [of the confirmed Plan] to mean, consistently with § 1141(d)(1), that Sullivan must survive all Section 727 proceedings before he can receive a discharge.... This interpretation of the Plan and § 1141(d)(1) compels, in this case, the conclusion that the agreement of the parties in the Plan can alter the usual operation of the Bankruptcy Code, which makes § 727(a) unavailable against Chapter 11 debtors except through the provisions of § 1141(d)(3).

> \* \* \* \* \* \*

> Although the parties have fully briefed the issues of whether Sullivan is entitled to a determination that he is continuing in business or that his Plan does not provide for liquidation, the Court finds this opinion renders those issues irrelevant. If the § 727 issues ... are finally resolved in favor of the Plaintiffs, Sullivan will never get a discharge; that is the import of

Section 9.1 of the Plan. If they are finally resolved in favor of Sullivan, Sullivan *must* get a discharge....

During the trial, after the close of the Plaintiffs' evidence, the Debtor filed a Motion to Dismiss in the nature of a motion for directed verdict under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(c). On February 18, 1994, the Court entered its Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("Directed Verdict Order"). The Directed Verdict Order dismissed the Plaintiffs' allegations under subsection (a)(3) of 11 U.S.C. § 727 but denied the Debtor's Motion to Dismiss the allegations under subsections (a)(2), –(4), and –(5), stating that "the Plaintiffs in this case have fulfilled their burden of going forward with proof to make a *prima facie* case under all of the above subsections of the statute" and that "the burden of going forward on these causes of action now shifts to the Defendant."

In summary, because of the peculiar language of Section 9.1 of the Plan and this Court's ruling in the Memorandum Opinion of April 1, 1993, the parties have litigated this Adversary, and the Court will enter judgment therein, as a model of a § 727 lawsuit, despite the fact that Sullivan is a Chapter 11 debtor. The Directed Verdict Order has narrowed the issues to subsections (a)(2), –(4), and –(5) of § 727. If the Plaintiffs prevail under any one of those subsections, Sullivan's discharge must be denied.

### FINDINGS OF FACT

In the 1980s, Sullivan was a Dallas real-estate broker, developer, consultant, and manager. He headed a business enterprise

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities....

that included a number of Sullivan-owned or affiliated businesses. He was also chairman of the board of a company known as Processors Unlimited Company ("PUC"); he was an investor in stocks and had interests in insurance companies. Sullivan had millions of dollars invested in real estate and stock, and he prospered in the early 1980s as the Texas real estate market flourished. He enjoyed the lifestyle of a wealthy man. He acquired a home situated on a 4.5–acre tract of land in a prosperous Dallas neighborhood. Tennis courts, playground equipment, a putting green, and a jogging trail were located on the land surrounding Sullivan's house. He and his wife collected art, antiques, jewelry, and other valuable collectibles. He owned Ferrari automobiles, a Mercedes, and several other cars and trucks.

Sullivan was aware, however, of the reversals that were beginning to take place in the real estate business, and he looked for ways to lessen the destructive impact of these reversals on his balance sheet. With this in mind, he and his attorney(s) devised ways to ensure that he could preserve much of his wealth in the face of financial adversity. The first step was Sullivan's creation of the Regent Trusts [4] on December 20, 1984, with Sullivan's brother Mark as trustee. On the same day, the Regent Trusts purchased a property known as Meadows North from Sullivan Investments, Inc. The Regent Trusts financed the purchase with a loan from Inter-First Bank Dallas, N.A., which Sullivan negotiated.[5] The Regent Trusts had no other assets and could not pay the InterFirst loan. Instead of transferring other assets to the Regent Trusts, Sullivan simply loaned the entity $1.5 million to pay the note.

About 1985, Sullivan created another entity designed to hold his personal assets out of the reach of creditors—Manhattan Beach Enterprises Corporation ("Manhattan Beach"). Sullivan owned 100 percent of the stock of Manhattan Beach. Manhattan Beach owned household assets, including antiques, fine art, and furniture. Almost all of the assets of Manhattan Beach were located in Sullivan's house or on the grounds surrounding his house.

With the crash of the Texas real estate market about a year later, Sullivan found the financial fears that prompted him to create Manhattan Beach and the Regent Trusts materializing. Sullivan's Financial Statement dated June 30, 1986, shows notes payable of more than $200 million. Most of this amount was secured by real estate, the value of which Sullivan saw diminishing. In the summer of 1986, Guaranty Federal Savings .& Loan ("Guaranty") made a demand on Sullivan for the $50 million he owed Guaranty on three promissory notes. To delay Guaranty's collection efforts, Sullivan filed a lawsuit against Guaranty in November 1986, asserting claims of lender liability and breaches of loan agreements. He also consulted attorney James Craig ("Craig"), who drafted an offshore trust agreement for Sullivan.[6] Sullivan then made the first of what would be many transfers of his personal assets to the Regent Trusts: He transferred 151,300 shares of Pennzoil Company stock with a total value of over $10 million to the trusts entity in December 1986.[7] Despite the transfer, Sullivan continued to make the margin payments on the stock.[8]

Sullivan suffered another serious financial setback as a result of the stock market crash

4. The Regent Trusts entity was created as the John R. Sullivan Trusts. The name was changed in January 1990 to disassociate the Regent Trusts from John Sullivan and the financial setbacks he had suffered.

5. Sullivan personally guaranteed the loan and pledged $2,000,000 to $3,000,000 of his own certificates of deposit to secure the loan. The bank extending the loan conditioned its agreement to loan the money on Sullivan's guaranty of the debt.

6. The offshore trust document was signed by Sullivan but was never fully executed. Craig later drafted the Korbel Trust and Sherwood

Trust agreements for Sullivan's father, which agreements were fully executed. As discussed infra, the Sherwood and Korbel Trusts were used ultimately for Sullivan's benefit.

7. Regent Trusts assumed Sullivan's margin balance, which was about $6.1 million, and executed a note for about $3.9 million.

8. Sullivan made the margin payments on this stock, and on all the stock that he transferred to Regent Trusts, until January 1989, when the Regent Trusts executed a Line of Credit Note to Sullivan in the amount of $1.5 million for the purpose of allowing Regent Trusts to pay the margin calls.

of October 1987. The crash required him to meet margin calls in excess of one million dollars. During the same month, Sandia Federal Savings & Loan ("Sandia") made a demand on Sullivan for payment of indebtedness in excess of $30 million. In November, Sullivan filed suit against Sandia, again asserting claims of lender liability. In the face of this increasing financial pressure, Sullivan transferred a 1973 Dino Ferrari, valued at $80,000, to the Regent Trusts on the 16th of November. The Regent Trusts paid no consideration, and Sullivan's wife Frances was not aware that Sullivan had transferred the asset, which was community property. Despite the transfer, the Department of Motor Vehicles had no record of the change of ownership, and Sullivan was registered as the owner of the car as of the Filing Date. In addition, Sullivan continued to maintain insurance on the car and pay for its maintenance and repairs. The car remained at his residence, and he continued to drive it.

## Increasing Transfers to the Regent Trusts

In 1988, Sullivan stopped making payments on loans of more than $12 million from NCNB National Bank ("NCNB") and on loans of more than $20 million from Texas American Bank. He also initiated lawsuits against BancBoston Real Estate Capital Corporation ("BancBoston") and Silverado Savings & Loan Association ("Silverado") after these lenders made demands for payments on indebtedness of more than $60 million.[9] By September 1988, Sullivan's companies were in default on at least $100 million in debt that Sullivan had personally guaranteed.

Not coincidentally, Sullivan's transfers to the Regent Trusts also began to increase substantially during this time. As illustrated in Table 1, Sullivan transferred over 1.5 million shares of stock to the Regent Trusts in February and April 1988. He continued to make the margin payments on this stock.[10]

**Table 1. Stock Transfers from Sullivan to the Regent Trusts in 1988**

| Date | Stock Transferred (Shares) | Margin Balance Assumed by the Regent Trusts | Note Executed by the Regent Trusts to Sullivan | Total Consideration Given by the Regent Trusts |
|---|---|---|---|---|
| 2/88 | DWG Corporation (551,900) Charter Company (120,000) Southeastern Public Services Company (2,500) Burnup & Sims (481,300) | $3,485,583.03 | $4,816,729.47 | $8,032,312.50 |
| 4/88 | DWG Corporation (279,700) Burnup & Sims (143,150) | Unknown * | $2,021,610.00 | $2,021,610.00 |

* Exact amount of margin debt not set forth in the documents evidencing the transaction. In addition, the transaction documents do not indicate that the Regent Trusts assumed the margin debt.

---

In May, Sullivan transferred his interest in a 365 P–4 Ferrari ("P–4") to the Regent Trusts. Norwood Ferrari Service, Inc. ("Norwood") was to construct the P–4 pursuant to an April 1988 agreement with Sullivan.[11] At the time of the transfer, the unfinished P–4 was valued at $90,000. As with the Dino Ferrari that was transferred in

9. A court ruled on the merits in only one of the five lender lawsuits. In the suit against Sandia, the court entered a judgment against Sullivan for $32 million. No executed settlements were entered in any of the other lawsuits.

10. *See supra* note 8.

11. The agreement provided that Sullivan was to deliver a GTO Bonneville Ferrari to Norwood in exchange for Norwood's delivery of the completed P–4 plus a cash payment of $40,000. Norwood was to deliver the completed P–4 and the cash payment one year from the date of the agreement.

1987, Sullivan's control of the P–4 did not change after the transfer. He continued to communicate exclusively with Norwood, and he continued to pay all invoices for amounts due for the P–4.

In June and September 1988, Sullivan conveyed two stock options to the Regent Trusts. The first option, conveyed on June 8, 1988, was for (i) 267 shares of Processors Unlimited Company ("PUC") for $10.00 and other good and valuable consideration, (ii) 138 shares for $430,000, and (iii) 1,350 shares for $5,000,000. The option was valued at $890,000. The second option, conveyed on September 6, 1988, was for an additional 405 shares of PUC. The Regent Trusts paid no consideration for the options. In addition, the exercise of the options by the Regent Trusts could have created tax problems for PUC by destroying PUC's subchapter S status. *See* 26 U.S.C. §§ 1361–1362 (1988). Although Mark Sullivan, the Regent Trusts' trustee, could have sold or transferred the options for the benefit of the Regent Trusts, he never sought to do so.[12] Sullivan only gave the Regent Trusts the options so that the PUC stock would be shielded from his creditors.

On June 21, 1988, Sullivan and his wife executed a Special Warranty Deed to convey 3.5 acres of the 4.5–acre tract that surrounded their home to the Regent Trusts. Sullivan and his family continued to use the property as they had prior to the transfer, and Sullivan continued to pay for the expenses related to the property. The deed transferring the property contained substantial restrictions on the use, development, and sale of the land, thus reducing its value. The primary intended effect of the transfer was to leave Sullivan with a one-acre urban homestead under Texas law, which would be exempt from attack by almost all creditors. Tex.Prop.Code Ann. §§ 41.001, 41.002 (West 1995).

In addition to controlling the assets that he transferred to the Regent Trusts, Sullivan assumed an even more direct and obvious role in the management of the Regent Trusts in May 1988, when he opened a brokerage account for the trusts. In opening the account, he provided information that was inaccurate as to the Regent Trusts but accurate as to Sullivan individually. Sullivan—not the Regent Trusts' trustee—had complete trading authority over the account, engaged in trades for the trusts through the account, and was designated as attorney-in-fact with respect to the account.

By March 1989, Sullivan had a negative net worth of $64,029,758, and yet he transferred another 1.2 million shares of stock to the Regent Trusts in the second half of 1989, as shown in Table 2.[13] All of these actions and transfers demonstrate how Sullivan controlled and manipulated the Regent Trusts for his own benefit by using the entity as a mechanism to shield his assets.

**Table 2. Stock Transfers from Sullivan to the Regent Trusts in 1989**

| Date | Stock Transferred (Shares) | Margin Balance Assumed by the Regent Trusts | Note Executed by the Regent Trusts to Sullivan | Total Consideration Given by the Regent Trusts |
|------|----------------------------|---------------------------------------------|-----------------------------------------------|-----------------------------------------------|
| 8/89 | Presidio Oil Co. (633,087) | $1,766,312.72 | $3,561,114.37 | $3,561,114.37 [1] |
| 9/89 | Presidio Oil Co. (386,197) | $1,214,077.42 | $1,585,850.83 | $2,799,928.25 |

12. In October 1992, the Regent Trusts released and waived the options to allow Sullivan to acquire all of the shares of PUC under the Plan without any consideration from Sullivan.

13. In exchange for all of the stock transfers that took place during the three-year period from December 1986 to December 1989, *see* Tables 1 and 2, Sullivan obtained nonrecourse promissory notes and took a junior security interest in the stock transferred. The security interest was a junior interest because the brokerage house already had a lien on the stock. To perfect his junior security interest, Sullivan would have had to obtain a written acknowledgment and agreement from the brokerage house. Although Sullivan was aware of these requirements, he never fulfilled them and failed to perfect his security interests.

| 12/89 | Burnup & Sims (73,700) | $1,009,744.29 | $1,218,105.71 | $2,227,850.00 [2] |
| | Charter (35,000) | | | |
| | Great American | | | |
| | Communications (75,000) | | | |

[1] The note amount included the margin debt.

[2] In 1987, this stock was sold by Sullivan to James Mentesana, Sullivan's father-in-law, or was purchased by Sullivan in Mr. Mentesana's name. Regardless, Mr. Mentesana was simply strawman for the transaction. The structure of the transaction was to make it appear that Mr. Mentesana owned the stock so that Sullivan could avoid disclosure requirements of the Securities and Exchange Commission. In March 1989, Mentesana transferred the stock to the Regent Trusts in exchange for the Regent Trusts' assumption of the margin debt and execution of the promissory note. In December 1989, Sullivan assumed the note in satisfaction of debt owed to him by Mentesana.

---

## Creation of Korbel Trust and Sherwood Trust

By January 1990, Sullivan's position and image in the marketplace had deteriorated so much that he was unable to obtain financing.[14] About this time, Sullivan directed the creation of two more family trusts: the Korbel Trust, created on February 6, 1990, and the Sherwood Trust, created on March 9, 1990. Although his father Walter was the settlor of the trusts, John Sullivan used him only as strawman. John Sullivan and his accountant James Howard ("Howard") initially approached Walter Sullivan about creating the trusts. Craig drew up the trust documents, which Walter Sullivan did not review prior to signing. Howard served as trustee of both trusts, at the request of John Sullivan. Walter Sullivan thought that he was creating the trusts for the benefit of his grandchildren, but the true purpose of the trusts was to provide John Sullivan with an income and a means for accomplishing investments and transactions that he could not make in his own name because of his inability to obtain financing. John Sullivan was the income beneficiary of the trusts. In sum, Sullivan himself had these trusts created for his own benefit, and he dominated and controlled them.

Sullivan controlled Howard's activities as trustee of the trusts. Howard never rejected any of Sullivan's investment proposals. Sullivan also controlled a brokerage account maintained in the name of Korbel Trust. The broker was Sullivan's broker, and Sullivan placed orders in the account. Margin calls in the account were directed to Sullivan. Korbel borrowed funds from Sullivan and/or the Regent Trusts to make the margin calls, although there is no documentation to reflect the loans and no evidence of any collateral related to such loans. Walter Sullivan has no knowledge of any transactions in which the trusts participated. He had no interest in what the trusts did and received no reports relating to them. About August 1990, the Sherwood Trust purchased the Meadows North property, which the Regent Trusts had previously transferred to another Sullivan-affiliated entity. The Sherwood Trust obtained $400,000 of the purchase price that it paid for the property from T. Ishida USA, Inc. ("Ishida"). Sullivan guaranteed the indebtedness to Ishida and secured it with a lien on an unencumbered ranch that he owned, the Star Mountain Ranch.[15] The Ishida transaction is typical of Sullivan's pattern of treating trust assets as his own and simultaneously using his own assets to facilitate the operations of the trusts.

## Transfers of Presidio Stock from the Regent Trusts to Korbel Trust

As Table 2 shows, Sullivan transferred over one million shares of Presidio Oil Co. stock to the Regent Trusts during 1989. In March 1990, the Regent Trusts transferred 434,197 shares of this stock to Korbel Trust in exchange for a nonrecourse promissory note in the amount of $1,573,964.12 and Korbel Trust's assumption of margin debt of the same amount. Sullivan directed the transfer because he wanted the Korbel Trust to generate more income, as he was the income

---

14. *See supra* note 4.

15. This transaction is described more fully in *A.M. Mancuso v. T. Ishida USA, Inc. (In re Sullivan),* 161 B.R. 776 (Bankr.N.D.Tex.1993).

beneficiary of the Korbel Trust.[16] Meanwhile, the transfer was detrimental to the Regent Trusts, because the Korbel Trust did not have any assets with which to make margin calls or to repay the debt without selling the stock itself.[17] To make the margin calls, Korbel Trust had to borrow $94,000 from the Regent Trusts in November 1990, although the funds borrowed actually came from Sullivan. The loan from the Regent Trusts to the Korbel Trust was unsecured. As of the time of trial, the Korbel Trust still owed the Regent Trusts for a portion of the stock loan and for all of the margin call loans, but the Regent Trusts' trustee had not attempted to collect the loan and could not recall the amount due. In December 1990, Korbel Trust transferred 341,790 shares of the Presidio stock back to the Regent Trusts. In January 1991, the Regent Trusts transferred 224,940 shares of Presidio stock to Sullivan. The Regent Trusts sold the remaining shares of Presidio stock and wired the $900,000 in proceeds to Sullivan's account. These activities further illustrate Sullivan's domination and control of the family trusts and his manipulation of these trusts for his own benefit.

### Encumbrance on the 3.5 Acres

Sullivan had borrowed $3.25 million from County Savings Bank in June of 1988. He had secured the loan with the 4.5–acre parcel on which his home was located. In December 1990, about one month before he filed for bankruptcy, Sullivan was able to modify the loan and thereby pledge 1,230 shares of PUC stock on the existing debt. The purpose of the pledge was to allow County Savings to satisfy Sullivan's obligation with the PUC shares rather than with his real property. Through the PUC stock pledge and the June 1988 transfer of the 3.5–acre tract to the Regent Trusts discussed *supra*, Sullivan "sheltered" the entire residence out of the reach of his creditors: One acre of the property was exempt as a homestead,[18] and the remaining 3.5 acres was titled in the name of the Regent Trusts. The pledge of the PUC

stock also placed the stock out of the reach of other creditors and the bankruptcy trustee.

### Transfers to Family Members During the Year Prior to Bankruptcy

Sullivan made a number of cash transfers to his family members in 1990, the year preceding his bankruptcy. He gave his wife Frances $75,000 in three separate payments in March, June, and September 1990. He also transferred a total of $60,000 to her via several payments of $7,500 and $5,000 during 1990.[19] Sullivan transferred $10,100 to his sister Karen MacArthur during the year prior to bankruptcy and $10,000 to his brother Mark just before filing for bankruptcy.

A few months before he filed bankruptcy on February 1, 1991, Sullivan received a transfer from his wife and transferred property to her in return. On December 31, 1990, Frances transferred $50,000 in community funds to Sullivan. The funds were deposited into the account of John R. Sullivan. Although Frances Sullivan was willing to transfer the funds without receiving assets in exchange, Sullivan suggested that she receive a Gerber painting and a Mercedes automobile in exchange. Because she had no real interest in receiving the property in exchange for the funds, she made no investigation of the value of the Mercedes or the painting before she purchased them, and she did not know how much the items were worth. The transfer of the property was a paper exchange only; the property was maintained at the Sullivan residence both before and after the transfer. Although Sullivan transferred this property to her, he did so on behalf of other Sullivan entities that owned the property, Manhattan Beach and Sullivan Development Co., Inc. ("SDC"). Even so, entries in Sullivan's general ledger reflect that the funds were paid to Sullivan for the purchase of personal property from Sullivan, rather than from Manhattan Beach and SDC. Also, Frances Sullivan had no idea that she was purchasing the painting

---

**16.** Sullivan's children were the income beneficiaries of the Regent Trusts.

**17.** Walter Sullivan had established the trust with a payment of $10,000 but had contributed no other assets to the trust.

**18.** Tex.Prop.Code Ann. §§ 41.001, 41.002 (West 1995).

**19.** He made monthly payments of $7,500 from March to August 1990 and payments of $5,000 for each month of September and November 1990 and January 1991.

from a Sullivan company. When he filed bankruptcy, Sullivan failed to disclose the transaction as he was required to do on his Statement of Affairs.[20] He also did not disclose that he had a community property interest in the painting and Mercedes on his bankruptcy schedules of assets.

### Post–Petition Transfers to Attorneys

As discussed *supra*, the Regent Trusts had transferred 224,940 shares of stock in Presidio Oil Co. back to Sullivan in January 1991. The shares were in Sullivan's brokerage account on the Filing Date. After the Filing Date, Sullivan directed his broker to sell the shares and transfer part of the proceeds to certain of his attorneys. Per Sullivan's requests, his broker transferred $250,000 of the proceeds to the law firm of Burke & Wright and $115,000 of the proceeds to Majorie & Associates in February and March 1991. These post-petition transfers were made for Sullivan's benefit and at his direction. These transfers were made without any court authorization or approval; as a result, these transfers were in violation of Title 11. *See* 11 U.S.C. §§ 327–330 (providing procedures for the employment and payment of attorneys).[21]

### Use of the YMAK Account by the Regent Trusts

After Sullivan's bankruptcy filing, the Internal Revenue Service ("IRS") levied on the Regent Trusts' bank account on March 8, 1991. The IRS levied on the account because the Regent Trusts entity could not pay its federal income taxes. After the levy, the Regent Trusts used the bank account of YMAK Associates, a limited partnership controlled by the Regent Trusts.[22]

As Sullivan controlled the Regent Trusts, the Regent Trusts' use of the YMAK account ultimately benefitted Sullivan himself. Checks were drawn on the YMAK account in amounts ranging from $30,000 to $50,000 for Westridge Realty, a company owned by Sullivan and the company he used for his operations after the Filing Date.[23] In June 1991, a check for $1,425 was written on the YMAK account to pay an invoice directed to John Sullivan. Also in June 1991, a check was drawn on the YMAK account for Texas Stadium Box 245 Partners, an entity in which Sullivan owned an interest.

### Sullivan's Bankruptcy Filing and False Oaths on His Bankruptcy Schedules

Sullivan's scheme to defraud his creditors did not end with his bankruptcy filing on February 1, 1991. Rather, his bankruptcy filing was merely the next step in that scheme. Sullivan first began to discuss personal and business bankruptcy with attorneys in the mid–1980s, and he began to discuss filing personal bankruptcy with Craig in July 1990. Craig and Sullivan began to work on Sullivan's Schedules and Statement of Financial Affairs ("Original Schedules and/or Statement" or "Schedules and/or Statement") months before Sullivan actually filed for Chapter 11. Sullivan actively participated in the process of preparing the Schedules and Statements. His attorneys went over all of the questions on the Schedules and Statements with him, and Sullivan reviewed in detail the drafts of the documents prepared by his employees before they were finalized. After reading the final documents, he signed the Schedules and Statement on March 4, 1991, and filed the documents on March 5, 1991. On June 29, 1993, he signed and filed Amended Schedules and Amendments to the Statement of Financial Affairs ("Amended Schedules and/or Statement").

**20.** Question 14 on the Statement of Financial Affairs inquires about transfers within one year of the bankruptcy filing.

**21.** Sullivan's Schedules reveal that he claimed that he had actually transferred stock worth $250,000 to Burke & Wright *prior* to the bankruptcy filing. What Sullivan failed to disclose, however, was that the stocks remained in his brokerage account and under his control *after* the Filing Date.

**22.** The following Sullivan-affiliated entities were partners of YMAK: Trez Corporation was the 5-percent general partner, the Regent Trusts entity was a 10–percent limited partner, Korbel Trust was a 10–percent limited partner, and the Sherwood Trust was a 75–percent limited partner. In turn, the Regent Trusts owned 100 percent of the stock of Trez Corporation.

**23.** The checks were denominated as loans and were unsecured. They remained unpaid and overdue at the time of trial. The trustee of the Regent Trusts had not made any attempt to collect on the loans.

When Sullivan signed both the Original and the Amended Schedules and Statements, he swore subject to the penalty of perjury that he had read the documents and that they were true and correct to the best of his knowledge, information, and belief.

Despite the seemingly careful preparation of the documents and Sullivan's sworn statement, the Original and Amended Schedules and Statements contained extraordinary numbers of omissions and inaccuracies. For example, Question 20 of the Statement required Sullivan to disclose whether he had transferred any money or property, or promised to transfer money or property, to an attorney rendering services to him in connection with the bankruptcy case. Sullivan was to disclose the amount or value transferred or to be transferred. As discussed previously, Sullivan stated in response to Question 20(b) that he had transferred stock of Presidio Oil Co. valued at $250,000 to the law firm of Burke & Wright the day prior to the bankruptcy filing. He knowingly failed to disclose, however, that the stocks remained in his brokerage account and under his control after the Filing Date. He also knowingly failed to list this property on his Schedules, although he knew the stock was property of the estate. Rather, he knowingly directed his stockbroker to transfer $250,000 of the proceeds from the sale of the Presidio stock in his account to the law firm Burke & Wright without Court approval. He directed and allowed this transfer even though he knew that the stock proceeds were property of the estate. His attorneys also knew that the property was property of the estate at the time of the transfer.

Other specific examples of the omissions and inaccuracies on Sullivan's statements are described in the following paragraphs.

### Question 5 of the Statement of Financial Affairs: Non–Business Income

Question 5 of the Original Statement required Sullivan to state what amount of income, other than from the operation of his business, he had received during each of the two years immediately preceding the Filing Date and to give particulars, including each source and the amount received from each source. The plain meaning of "income" is defined as the returns that come in—revenue or receipts. This means *all* receipts—*all* revenue. Sullivan knowingly and fraudulently failed to disclose material amounts of income that he received other than from the operation of his business in the two 12–month periods prior to his bankruptcy filing. He also knowingly reported vague and incorrect amounts of income for the two years prior to his bankruptcy in his Statement of Financial Affairs. The undisclosed amounts included the following:

(a) In response to Question 5's inquiry about income received during the year immediately preceding the bankruptcy, Sullivan provided only an "estimate" of his income for calendar year 1990, not for the 12–month period preceding the bankruptcy filing. This was a nonresponsive and inaccurate answer, as it did not include January 1991 as the 12th month.[24] The income Sullivan received in January 1991 included dividends from PUC of approximately $72,512.40, capital distributions from PUC of approximately $63,000, and loan repayments. Thus, the amount of income omitted was material. Sullivan purposely never amended his response to Question 5 to include his income for the 12 months ended January 31, 1991. He also never amended his Schedules to provide final information about his 1990 income. Sullivan also listed his "tax return net income" rather than his gross income, even though the question clearly calls for gross income and not "net" income. His response also included income received from the operation of his business, despite the clear language of the Question.

(b) Sullivan knowingly did not disclose dividend income that he received from PUC in 1989 and 1990. In 1989, he received $503,400.28 in dividend income; in 1990, he received approximately $1.1 million in dividend income.

(c) Sullivan failed to disclose the $50,000 he received from Frances Sullivan, allegedly in exchange for the Gerber painting and a Mercedes automobile.[25] This amount consti-

---

24. An estimate might have been reasonable if it had conformed to the question asked in the Statement by including Sullivan's income from January 1991.

25. *See supra* discussion on page 928.

tuted income that was received other than from the operation of business, and Sullivan knew he was omitting the information.

(d) Sullivan also knowingly failed to disclose loan payments that were made to him by several entities during the two years preceding the Filing Date. He received approximately $900,000 from the Regent Trusts, $227,000 from Buckhorn Ranch Partnership, and $175,000 from Manhattan Beach. He also failed to disclose $135,000 in loan payments which he received from Certified Performance Groups in 1990. All of these payments included both principal and interest. All constituted "income" for the purposes of Question 5 and should have been disclosed.

(e) On October 27, 1989, Sullivan received payments in the amounts of $93,127.29 and $618,105.71 from or on behalf of Mr. Mentesana, Sullivan's father-in-law. The payments related to the stock transaction involving Mr. Mentesana and Sullivan.[26] The payments constituted income for the purposes of Question 5 and were intentionally omitted.

### Question 19 of the Statement of Financial Affairs: Withdrawals from Businesses

Question 19 of the Statement of Financial Affairs required Sullivan to disclose personal withdrawals that he made from his businesses during the year immediately preceding the filing of the petition. Sullivan's response on the Original Statement was "[n]ot applicable, see Exhibit C." Exhibit C is Sullivan's response to Question 5 of the Statement, which the Court discussed *supra.* Unfiled drafts of Sullivan's Schedules indicate that this answer was provided in place of answers which disclosed substantial withdrawals. On a draft dated March 4, 1991, the response to Question 19 disclosed that Sullivan had received $530,762 in personal withdrawals from his businesses. This answer was crossed out, and the response referring to Exhibit C was written above it. Thus, it appears that Sullivan fraudulently

intended to subsume his withdrawals from his businesses in the general estimated tax return information for 1990. Both this answer and, as already noted, the estimated tax return information were nonresponsive to the questions asked on the Original Statement. Moreover, the draft answer to Question 19 illustrates Sullivan's intentional manipulation and concealment of information.

### Question 7(a) of the Statement of Financial Affairs: Financial Accounts, Certificates of Deposits, Shares in Banks and Other Financial Institutions

Question 7(a) of the Statement of Financial Affairs required Sullivan to state what accounts or certificates of deposit or shares in banks, savings and loans, thrifts, building and loan and homestead associations, credit unions, brokerage houses, pension funds, and the like he had maintained, alone or together with any other person and in his own or any other name, within the two years prior to the Filing Date. With respect to each such account, he was required to disclose the name and address of each institution, the name and number under which the account was maintained, and the name and address of every person authorized to make withdrawals from such account. Sullivan intentionally failed to disclose eight bank accounts and one brokerage account in which he had an interest on the Filing Date. Five of the eight bank accounts were disclosed on the Amended Statement that he filed.[27] One of the accounts listed on the Amended Statement, the Bickel & Brewer Account, was listed on a draft of the Original Statement, indicating that Sullivan knew or should have known about the account at that time but consciously failed to disclose it.

Sullivan never disclosed three of the bank accounts and the brokerage account, which he controlled. All of these accounts were denominated "Frances Sullivan" or "Frances M. Sullivan," and the funds in these accounts were community property, as John Sullivan's earnings during marriage were the source of the funds deposited.[28] Although Sullivan

---

**26.** *See supra* Table 2, note 2, for more information on the stock transaction.

**27.** The five bank accounts disclosed on the Amended Statement were as follows: (1) Bickel & Brewer (Escrow Account for John R. Sullivan); (2) Buckhorn Ranch; (3) John R. Sullivan;

(4) John R. Sullivan; and (5) John R. Sullivan or Frances Sullivan.

**28.** *See* Tex.Fam.Code Ann. § 5.01 (West 1993) (defining separate and community property). One of the accounts was a checking account at Texas Commerce Bank that had a balance between

failed to list these accounts in his answer to Question 7(a), he included the funds in the accounts in the "cash" portion of his financial statements. On the Filing Date, the brokerage account held 2,500 shares of Class A stock of Presidio Oil Co., which had a value of approximately $19,750. The account was opened with a transfer of funds from a joint account of Sullivan and his wife, and all of the stock in the account on the Filing Date was purchased during marriage with community funds. The stock was community property and an asset of the estate as of the Filing Date.[29]

### Question 8 of the Statement of Financial Affairs: Property Held for Another Person

Question 8 of the Statement of Financial Affairs required Sullivan to disclose what property he held for any other person and to provide the names and addresses of these persons, a description of the property, the amount or value of the property, and all writings relating to the property. Sullivan knowingly failed to disclose the following property that he held for others on the Filing Date:

(a) fine art, antiques, and furniture of substantial value owned by Manhattan Beach;

$50,000 to $75,000 on the Filing Date. The funds in the checking account were used to pay ordinary household expenses. The second account was a supersavings account at Texas Commerce Bank, with a balance of approximately $125,000 as of the Filing Date. The deposits into the savings account were made from checks drawn on the John R. Sullivan account and were earnings from his business generated during his marriage to Frances Sullivan. Some of the funds from the savings account were used to purchase clothes for Frances Sullivan and the Sullivan children. The third account was a certificate of deposit, which Frances Sullivan held in her name on the Filing Date ("CD"). The CD had a value of approximately $20,000, and the funds used to purchase the CD were Sullivan's earnings during marriage. On the Filing Date, each of these assets was community property and an asset of the estate. *See* Tex.Fam.Code Ann. §§ 5.01, 5.22; 11 U.S.C. § 541(a)(2).

29. *See* Tex.Fam.Code Ann. §§ 5.01, 5.22; 11 U.S.C. § 541(a)(2). The stock was not a gift from Sullivan to Frances Sullivan, nor was the stock purchased with funds which Sullivan gave his wife. Frances Sullivan did not use or manage the brokerage account—she had no contact with the Jefferies & Co. brokers, she did not make stock trades, she did not pay any monies to make

(b) a Dino Ferrari that he claimed to have transferred to the Regent Trusts;

(c) stock of the Preston Trails Golf Club which Sullivan claimed was owned by SDC;[30] and

(d) an Autocraft Cobra replica that Sullivan claimed was SDC's property.

### Question 9 of the Statement of Financial Affairs: Property Held by Another Person

Question 9 of the Statement of Financial Affairs required Sullivan to disclose property that had value and in which he had an interest that was held by another person. He was also to provide the name, address, location, description of the property, and the circumstances of the holding. On the Filing Date, other persons held the following property of a material value in which Sullivan had a legal or equitable interest, which Sullivan intentionally did not disclose:

(a) Sullivan had a community property interest in three bank accounts and a stock brokerage account maintained in the name of his wife Frances.[31]

(b) Because Manhattan Beach was a mere conduit of Sullivan, Sullivan had an interest in personal property held by a warehouseman in California.[32]

margin calls, and she did not place orders to purchase or sell stock. In contrast, John Sullivan arranged to have the account opened in his wife's name, had discretionary trading authority with respect to the account, made all stock trades, and transferred all funds needed to make margin calls. The margin call payments were not loans from Sullivan to his wife.

30. Sullivan executed a check by SDC to pay for the stock in 1981. He held the stock in his own name, however, and it entitled him to a membership in the Preston Trails Golf Club. An application for membership dated April 8, 1980, indicates that Sullivan individually applied for membership in the golf club.

31. *See supra* note 28 and accompanying text.

32. Sullivan had personal property, primarily furniture, stored in a warehouse in California. The property was purchased to furnish and decorate a condominium that was to be purchased. Sullivan had never seen the furniture and testified that he believed the property did not have much value in excess of the charges owed for the storage of the furniture. The amount of storage charges outstanding on the Filing Date, however, was only about $1,600. An inventory of the

(c) Sullivan retained a beneficial interest in the P–4 Ferrari replica (or the parts of such an automobile) that was to be built by Norwood and that was owned supposedly by the Regent Trusts.

(d) Sullivan had a beneficial or equitable interest in the 3.5–acre tract of land that he transferred to the Regent Trusts in June 1988, because the Regent Trusts entity was a mere conduit of Sullivan.

(e) Sullivan had an interest in the Meadows North property that was held by the Sherwood Trust, because Sherwood Trust was a mere conduit of Sullivan.

(f) Sullivan had a community property interest in the Mercedes automobile and Gerber painting that supposedly were transferred to Frances Sullivan, as discussed *supra*.

### Question 14(a) of the Statement of Financial Affairs: Unusual Gifts

Question 14(a) of the Statement of Financial Affairs required Sullivan to disclose any gifts other than ordinary and usual presents to family members and charitable donations during the year prior to the Filing Date. He was to provide the names and addresses of donees and dates, descriptions, and values of the gifts. Sullivan intentionally failed to disclose three gifts of $25,000 that he made to his wife in March, June, and September 1990.

### Question 14(b) of the Statement of Financial Affairs: Non–Gift Transfers Not in the Ordinary Course of Business

Question 14(b) of the Statement of Financial Affairs required Sullivan to disclose whether he had made any transfers other than gifts which were not in the ordinary course of business during the year prior to the Filing Date. He was to list the following information: a description of the property; the date of the transfer or disposition; the entity to whom the property was transferred or how it was disposed of; whether the transferee was a relative, partner, shareholder, officer, director, or insider; the consideration, if any, received for the property; and the disposition of such consideration. Although Sullivan was aware that he must make full disclosure, he knowingly failed to disclose a number of transfers made within the year prior to the Filing Date that were not gifts and were not made in the ordinary course of business, to wit:

(a) Sullivan did not disclose a number of monthly transfers that he made to his wife during the year prior to his filing for bankruptcy. From March 1990 to August 1990, he transferred $7,500 per month to her. He gave her $5,000 for each of the months of September and November 1990 and January 1991. The monthly transfers totalled $60,000 and were not gifts or for ordinary family or household expenses, as they were not reasonable and were done to stash funds.

(b) On April 23, 1990, Sullivan transferred $42,422.40 to a company called "For Children" as a partial payment for a sapphire and diamond necklace.

(c) During the year prior to the Filing Date, Sullivan transferred an aggregate of $1,645,000 to the Regent Trusts.

(d) Sullivan failed to disclose in response to Question 14(b) that he had transferred approximately $243,000 to the Buckhorn Ranch partnership during the year prior to the Filing Date.[33]

(e) Sullivan did not disclose transfers of at least $290,000 to Manhattan Beach made within one year of the Filing Date. *See* Plaintiff's Exhibit C.

(f) Sullivan failed to disclose a transfer of $43,725 to his father Walter, or to a brokerage account in the name of Walter Sullivan on May 3, 1990.

(g) In January 1991, shortly before the Filing Date, Sullivan transferred approximately $65,000 to the law firm of Majorie &

---

items in storage provided to Sullivan by the storage company valued the items at over $50,000. The bankruptcy trustee was attempting to sell the items for at least $20,000. Sullivan's testimony that the furniture was without value was not credible, and he did not disclose this furniture on his Statement.

**33.** Sullivan claimed that these transfers were to repay loans, but he had no documentation to prove that such loans existed.

Associates. Despite the close proximity of this transfer to the Filing Date, the payment was only included on the Amended Statement. As Sullivan was not in the business of litigation, he should have disclosed his transfer of fees to attorneys for litigation services on his Original Statement.

(h) A transfer of $10,100 to his sister Karen MacArthur was omitted intentionally from the Original Schedules.

(i) A transfer of $56,106.52 to Questhill, Ltd. on about October 23, 1990, was intentionally omitted. The purpose of the transfer was the purchase of furniture for Sullivan's house. The payment was charged on Sullivan's general ledger to his personal property account.

(j) In August 1990, Sullivan transferred $50,000 to John Gourley. The transfer was to purchase an option to buy PUC stock that Gourley owned.

(k) On January 31, 1991, the day before Sullivan filed for bankruptcy, he transferred $10,000 to his brother Mark, supposedly for services that Mark Sullivan provided to certain Sullivan affiliates. This payment was intentionally not disclosed, and the transfer was not made in the ordinary course of business.

(*l*) During the year prior to the Filing Date, Sullivan transferred $133,000 to Norwood to pay for the construction of an A-12 concept car.

### Question 20(a) of the Statement of Financial Affairs: Consultations With Attorneys

Question 20(a) of the Statement of Financial Affairs required Sullivan to disclose the attorneys with whom he consulted during the year prior to the Filing Date, or since the Filing Date, and to give the date, name, and address of each attorney. Sullivan failed to disclose his consultations with the following law firms or attorneys:

(a) the law firm of Burleson, Pate & Gibson;

(b) the law firm of Denton & Guinan; and

(c) the law firm of Kaplin, Rosenfeld & Feiger.

### Schedule A–2: Creditors Holding Security

Schedule A–2 required Sullivan to disclose all secured creditors. Sullivan knowingly failed to disclose that Ishida held a security interest in Sullivan's Star Mountain Ranch property. The Ranch was security for a $400,000 loan from Ishida to the Sherwood Trust, which financed in part the purchase of the Meadows North property by the Sherwood Trust. For purposes of responding to Schedule A–2, Ishida was a creditor of Sullivan, and Sullivan should have listed Ishida on Schedule A–2. Sullivan later amended his Schedules to reflect the lien.

### Schedule B–1: Real Property

Schedule B–1 required the disclosure of all real property in which Sullivan had an interest. He was to list the nature of the interest and the market value of the property. Sullivan failed to disclose fully all of his interest in real property, as follows:

(a) Although Sullivan listed Star Mountain Ranch on Schedule B–1, he grossly undervalued the property.

(b) Sullivan knowingly failed to list the 3.5–acre tract surrounding his homestead on Schedule B–1. As discussed previously, Sullivan had a beneficial and equitable interest in the 3.5 acres in that he had the full use of the 3.5 acres for tennis, jogging, and other activities.

(c) Sullivan intentionally did not disclose his beneficial or equitable interest in the Meadows North property. Although the property was titled in the name of the Sherwood Trust on the Filing Date, Sullivan had a beneficial interest in the property, as he controlled the Sherwood Trust.

(d) On the Filing Date, Sullivan had a warranty deed that reflected that he owned a 28.4–acre tract in Grand Prairie, Texas. Sullivan initially failed to disclose this property interest, although he did disclose it on his Amended Schedules.

### Schedule B–2: Personal Property

Sullivan was required to disclose all of his personal property on Schedule B–2 and to include the description and location of the property and the market value of the property. Sullivan intentionally did not fully disclose his interests in personal property.

(a) Schedule B–2(b) required Sullivan to disclose all of his deposits with banking institutions, savings and loan associations, brokerage houses, credit unions, public utility companies, landlords, and others. Sullivan disclosed that he had an aggregate of $593,546.51 in various bank accounts as of the Filing Date. He knowingly failed to disclose, however, the following deposits:

(i) funds in an account denominated the Bickel & Brewer Escrow Account;

(ii) approximately $125,000 in the savings account denominated Frances M. Sullivan, in which he had a community property interest;

(iii) approximately $50,000 to $75,000 in the checking account denominated Frances Sullivan, in which Sullivan had a community property interest; and

(iv) approximately $20,000 in a certificate of deposit denominated Frances M. Sullivan.[34]

(b) Parts (c), (d), and (e) of Schedule B–2 required Sullivan to disclose his household goods, supplies, furnishings, books, pictures and other art objects, collections of any sort, wearing apparel, jewelry, firearms, sports equipment, and other personal possessions. Sullivan's responses on parts (c), (d), and (e) were materially incomplete and inaccurate, as follows:

(i) Rather than provide the description and location of this property, Sullivan fraudulently answered "appraisal in process" on his Original Schedules. Sullivan contended that the appraisal he was referring to was a fair market value appraisal by Rosen Systems, Inc. ("Appraisal"). This Appraisal was dated July 18, 1991, and was transmitted to the bankruptcy trustee on about September 5, 1991. Sullivan, however, intentionally did not amend his Original Schedules to reflect the value of his property as determined by the Appraisal. In addition, Sullivan and his attorneys chose an auctioneer who they knew to be unqualified to make the Appraisal. Moreover, the Appraisal failed to include a number of items. Sullivan tried to exclude and hide certain items from the Appraisal, including his two most valuable paintings.[35] Sullivan's explanation that he meant to include the items with his appraisal-in-process response is not plausible. The values attributed to the items in the Appraisal also were significantly below the true market values of the items.

(ii) Sullivan underestimated the value of his personal property. He listed the value of all the property required to be listed in response to parts (c), (d), and (e) of Schedule B–2 as $166,000. The true market value of Sullivan's personal property on the Filing Date vastly exceeded the value listed on his Schedules. Sullivan purposefully underestimated the value of his personal property because he and his lawyers believed that he would be able to repurchase this property at the below-market price.

(iii) On the Filing Date, Sullivan had a community property interest in jewelry that he claimed was his wife's separate property. He did not present clear and convincing evidence to rebut the presumption that the jewelry was community property. *See* TEX.FAM.CODE ANN. § 5.02 (West 1993). The jewelry was not described or valued on Schedule B–2(c) or anywhere else on the Schedules and Statements. Sullivan was aware that he should have disclosed the jewelry on his Schedules and Statements.

(iv) Sullivan failed to provide a description, location, or value of his personal property that was stored in a warehouse in California. The property had substantial

---

34. *See supra* note 28 for an explanation as to why John Sullivan had a community property interest in the Frances Sullivan accounts.

35. The following items were not described in the Appraisal: a Piaget watch; a Patek Philippe watch; jewelry, including cuff links, a wedding ring, and a belt and buckle; wearing apparel; a Coptic niche (sculpture, boy with grapes); a Sumbanese stele (sculpture, rock fragment); Sumatran silver earrings; a tiger-skin rug; a chest (commode); a leopard-skin or cheetah-skin rug; a gun or guns; fishing equipment; from 8 to 15 trophies (animal heads); a five-pound silver ingot; a metal mask; a sculpture of a man's face; two oriental sculptures; an antique mirror; a mantel clock; a stone bench; a stone garden sculpture; a painting by DiGeorgio; two antique planters; and two sphinx sculptures. In addition, two paintings, one by the artist Puy and the other by the artist Guillaumin, were listed in the Appraisal but were not described properly. Sullivan was aware of the misdescriptions on the Appraisal.

value and should have been disclosed on Schedule B–2(c). The property was not included in the Appraisal, and Sullivan did not advise his attorneys of the existence of the property prior to filing the Original Schedules and Statements.

(v) Sullivan purposely failed to provide a description and location of his personal property assets that were located at the Buckhorn Ranch. The property should have been disclosed on Schedule B–2(c). Sullivan claimed that he included the description and value of this property in response to Schedule B–2(i), which requires disclosure of farming equipment, supplies, and implements. The Court finds no credence to this claim, in part because Sullivan's response to Schedule B–2(i) does not refer to any furnishings located at the Buckhorn Ranch.

(c) Schedule B–2(f) required Sullivan to disclose the description, location, and market value of automobiles, trucks, trailers, and other vehicles. His disclosure on Schedule B–2(f) was incomplete in several material respects.

(i) Sullivan did not list his Dino Ferrari on his Schedules. Sullivan remained the registered owner of the Dino Ferrari on the Filing Date, although he had allegedly transferred the car to the Regent Trusts. Sullivan later admitted that he owned the Dino Ferrari on his Amended Schedules.

(ii) Sullivan also had a legal or equitable interest in the P–4 Ferrari replica to be built by Norwood.[36]

(iii) Sullivan intentionally failed to disclose the 1984 Autocraft Cobra replica that was registered in the name of Sullivan and on which Sullivan maintained insurance, although he listed the vehicle on his Amended Schedules.

(iv) Sullivan failed to disclose several other vehicles that he owned—a 1972 Ford flatbed truck, a Chevrolet pickup truck, and two Kawasaki four-wheel vehicles.

(v) Sullivan failed to disclose his interest in a 1986 560 SL Mercedes Benz automobile that was transferred by a Sullivan-owned entity to Frances Sullivan prior to the Filing Date.[37]

(d) Schedule B–2(p) required Sullivan to provide information relating to other liquidated debts that were owed to him. Sullivan's general ledgers and drafts of his Statement and Schedules reflected $5.5 million in receivables that were not listed on the final draft of his Statement and Schedules.[38] He intentionally failed to list a number of debts that individuals owed him as of the Filing Date, including the following:

(i) his sister Karen MacArthur owed him $10,100, which he later listed on his Amended Schedules;

(ii) Manhattan Beach owed him at least $866,342;

(iii) Buckhorn Ranch partnership owed him approximately $675,000;

(iv) Ray Koonce, Sullivan's brother-in-law, owed Sullivan approximately $6,500, as Sullivan's general ledger and drafts of his Schedules indicate;

(v) Sullivan loaned Sullivan-affiliated Westridge Realty $22,500 the day before the Filing Date.

(e) Schedule B–2(q) required Sullivan to disclose information regarding any contingent or unliquidated claim of every nature, including counterclaims, and to provide an estimated value of each claim. Sullivan failed to disclose that, as of the Filing Date, he had a contingent and unliquidated claim against the law firm of Bickel & Brewer for prepetition legal services. Sullivan was aware of the claim before he filed his bankruptcy petition and intentionally decided not to list the claim. Sullivan acknowledged the claim on his Amended Schedules. His confirmed plan of reorganization provides for the transfer of the claim against Bickel & Brewer to Sullivan.[39]

---

**36.** *See supra* note 11 for discussion of the agreement to build the car.

**37.** *See supra* page 928.

**38.** Some of the obligors were shown on Schedule B–2(t), which required disclosure of stocks and interests in companies.

**39.** *See* Trustee's Revised Second Amended Modifications to Second Amended Plan of Reorganization.

(f) Schedule B–2(t) required Sullivan to disclose his interests in stock and in incorporated and unincorporated companies. Sullivan failed to disclose the following interests in several incorporated and unincorporated companies:

(i) Sullivan intentionally failed to disclose that he owned 224,940 shares of Presidio Oil Co. Class A stock on the Filing Date. The stock was maintained in an account denominated John Sullivan at Jefferies & Company, Inc. After the payment of the margin debt, the value of the stock on the Filing Date was approximately $350,000.

(ii) Sullivan intentionally failed to disclose another 2,500 shares of Presidio Oil stock in which he had at least a community property interest on the Filing Date. The stock was held in an account denominated Frances M. Sullivan at Jefferies & Company, Inc. The shares had a value of approximately $19,750 on the Filing Date.

(iii) Sullivan intentionally failed to disclose his true ownership of a stock certificate that entitled him to a membership in the Preston Trails Golf Club. Sullivan included the membership in the March 4, 1991, draft of the Schedules. He also included the membership in his Amended Schedules, although he listed the value of the membership as zero. Sullivan was well aware that the stock had value on the Filing Date. Sullivan noted on the Amended Schedules that he held the membership in his name in accordance with the club's policy, but that he regarded the stock as an asset of SDC. When Sullivan purchased the stock, he knew that the membership could only be held in the name of an individual. In addition to submitting the membership in his name, he personally bid for the purchase of the stock. Sullivan's assertion that he did not own the stock, or at least have a beneficial or equitable interest in the stock, is not credible.

(iv) Sullivan failed to disclose that he owned stock or interests in Medical Receivables Corporation of Texas, Inc. Sullivan included this corporation on his Amended Schedules but listed the estimated value of the company's stock as zero. Schedule B–2(t), however, does not excuse debtors from listing stock because it does not have value. Sullivan knowingly omitted the stock from the Original Schedules.

(v) Sullivan did not disclose his ownership interest in a company called National Marketing Services, Inc. on his Original Schedules, even though the company was an operating business on the Filing Date. He included the company on his Amended Schedules.

(vi) On the Filing Date, Sullivan owned 5,000 shares of Texas Bank & Trust, which had a value of approximately $10,000. He listed this stock on his Amended Schedules.

(g) Schedule B–2(v) required Sullivan to disclose any equitable and future interests in life estates and rights or powers exercisable for his benefit. He disclosed an interest in the Sherwood Trust and the Korbel Trust and attributed a market value of $20,000 to these interests, but he greatly undervalued them. He failed to disclose that he was an income beneficiary of these trusts. Sullivan based his valuation on the settlor's initial contributions of $10,000 to each of the trusts. Sullivan knew that the value of the assets in the Sherwood Trust on the Filing Date far exceeded $20,000, as he knew that the Sherwood Trust owned the Meadows North property and an interest in a building called Westwood II.

### Schedule B–3(b): Property Not Otherwise Scheduled

Schedule B–3(b) required Sullivan to disclose property that was not otherwise scheduled. Sullivan failed to disclose that, as of the Filing Date, he was entitled to a $50,000 payment upon the sale of the Meadows North property.

### Materiality and Intent

The above-described omissions and inaccuracies were material errors and were not the result of inadvertence or honest mistake. Sullivan and his attorneys were aware, or should have been aware, of the inaccuracies and omissions in the Original and Amended Schedules and Statements. Sullivan and his attorneys made the omissions and misstatements with fraudulent intent and/or with

reckless disregard for the truth. Unfiled drafts of the Schedules and Statement were inconsistent with the Original Schedules and Statement, indicating Sullivan's manipulations of his responses to the questions on the Schedules and Statement. His explanation of why he answered questions the way he did was not reasonable or credible. The questions in the Schedules and Statement are clear and unambiguous, but the answers concocted by Sullivan and his attorneys were vague and misleading. Sullivan was a sophisticated businessman who should have understood what information the Schedules and Statement requested.[40] Sullivan played an active role in preparing the Schedules and Statement. Although he filed Amendments to his Original Schedules and Statement, the Amendments did not correct all of the previous omissions and misstatements. For example, Sullivan never disclosed his January 1991 income, nor did he provide a full description or a reasonable valuation of his personal property. Moreover, the Amendments were filed more than two years after the filing of the Original Schedules and Statement. The Court finds that Sullivan used the time between the filing of his Original Schedules and Statement and the filing of the Amended Schedules and Statement to alter, or to have altered, his books and records, so as to conceal even more inaccuracies and omissions on his Schedules and Statements.[41]

Regardless, Sullivan knew it was ultimately his responsibility to ensure that both the Original and the Amended Schedules and Statements were accurate and complete. He knew his creditors would rely on these Schedules and Statements, but he purposely failed to use reasonable diligence in completing them. His conduct with respect to the preparation of the Original and Amended Schedules and Statements and the signing of the oaths constituted a pattern of intentional omissions, misstatements, and deceit.

## CONCLUSIONS OF LAW

The discharge exceptions remaining for the Court's consideration in this Adversary are subsections (a)(2), (a)(4), and (a)(5) of 11 U.S.C. § 727. *See supra* Procedural Background. The Court will discuss denial of discharge pursuant only to § 727(a)(2) and – (4).

■ Plaintiffs have the burden of proving by a preponderance of the evidence that Sullivan should be denied his discharge in bankruptcy. *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 930 n. 1 (5th Cir.1993), citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174 (5th Cir.1992). Exceptions to discharge are to be construed liberally in favor of the debtor and strictly against the objecting creditor. *First National Bank of Amarillo v. Holmes (In re Holmes)*, 121 B.R. 505, 508 (Bankr.N.D.Tex.1990); *Inter-First Bank Greenville, N.A. v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr.N.D.Tex. 1986), citing *Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452 (5th Cir.1974). With these considerations in mind, the Court will first consider whether Sullivan's discharge should be denied under § 727(a)(2).

### Section 727(a)(2): Intentionally Fraudulent Transfer or Concealment

■ A debtor may be denied a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition...." 11 U.S.C. § 727(a)(2).

### *Transferring, Removing, Destroying, Mutilating, or Concealing Property Within One Year Before the Filing Date and the Continuing Concealment Doctrine*

■ To meet their burden of proof under § 727(a)(2)(A), the Plaintiffs first must show

---

**40.** Sullivan claimed that he omitted some of the information on the basis of advice from his attorneys. His reliance on this advice was not reasonable or credible.

**41.** His accountant testified that the books were reversed as to many entries after the Filing Date.

that Sullivan transferred, removed, destroyed, or concealed the Debtor's property. Sullivan transferred large amounts of cash to his wife, brother, and sister within one year of bankruptcy. As noted in the Findings of Fact, the transfer of $10,000 to the Debtor's brother Mark was made the very day before Sullivan filed for bankruptcy. These transfers alone satisfy the first element of § 727(a)(2)(A).

Sullivan made many other transfers, however, several years prior to his bankruptcy filing. For example, Sullivan transferred the Dino Ferrari in November 1987, the P–4 Ferrari in May 1988, the PUC stock options in June and September 1988, and various publicly traded stocks between December 1986 and December 1989. Because the transfers were made more than one year prior to the bankruptcy filing, § 727(a)(2)(A) does not apply on its face. However, "in cases where the plaintiff can prove that the debtor retained control or an equitable interest in the property, the courts have appropriately denied discharge under the theory of continuing concealment." *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 n. 4 (5th Cir.1987), quoting *Ohio Citizens Trust Co. v. Smith (In re Smith)*, 11 B.R. 20, 22 (Bankr.N.D.Ohio 1981). A concealment is accomplished by "a transfer of title coupled with the retention of the benefits of ownership." *Olivier*, 819 F.2d at 553. "A concealment ... need not be literally concealed. The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute concealment." *Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127, 128 (7th Cir.1981). Retention of the benefits of ownership (an equitable or beneficial interest) has been found when the debtor's funds were used to acquire the asset, when the debtor treats the asset as his own, and when the debtor has the use and enjoyment of the asset. *In re Walter*, 67 F.Supp. 925, 925–26 (S.D.N.Y.1946). Control of property held in the name of another is also an element evidencing a continued inter-est, especially when assets are transferred to family members or close associates. *See, e.g., Hubbell Steel Corp. v. Cook (In re Cook)*, 126 B.R. 261, 267–68 (Bankr.E.D.Tex.1991); *Penner v. Penner (In re Penner)*, 107 B.R. 171, 176 (Bankr.N.D.Ind.1989).

The effect of the doctrine of continuing concealment is to extend the reach of § 727(a)(2)(A) to transfers that occurred more than a year before bankruptcy. *Olivier*, 819 F.2d at 554–55. The doctrine applies when the debtor retains a secret interest in the transferred property that continues, with the requisite intent, into the year before bankruptcy. *Id.* In *Olivier*, the Fifth Circuit specifically authorized the use of the continuing concealment doctrine in discharge cases involving § 727(a)(2)(A) in certain factual circumstances. *Id.* at 555.[42]

Sullivan fraudulently concealed his property using his wife and other family members, the Regent Trusts, the Sherwood Trust, the Korbel Trust, and Manhattan Beach. He transferred the property but continued to use and benefit from the assets because he controlled the trusts and their trustees and the corporation. The trustees of the trusts entered into virtually no transactions without Sullivan's approval and active participation. Sullivan intended to shelter the assets held in the trusts in the event he lost his lawsuits against his lenders. He controlled Manhattan Beach, as he was the sole shareholder and director of the corporation; it had no business or reason to exist except as a make-believe corporation to "own" Sullivan's personal property.

Sullivan maintained a secret beneficial interest in property that he transferred to the trusts, Manhattan Beach, and his wife. These interests were evidenced by the following: his extension of loans to family members and to the Regent Trusts to allow them to acquire certain property; his continued use and enjoyment of the property transferred; and his continued control of transferred property. Sullivan continued to exer-

---

**42.** *Olivier* involved debtors who transferred the record title to their home while retaining a "secret beneficial interest" in the home. The transfer took place seven years prior to the bankruptcy filing. The court found that the debtors continued to live in the home, maintained the home, paid for insurance on the property, and did not pay rent to the transferee. *Olivier*, 819 F.2d at 551.

cise control over these assets as though he continued to own them. These concealments continued into the year prior to the commencement of the bankruptcy case on February 1, 1991.

### Intent to Hinder, Delay, or Defraud

Under § 727(a)(2)(A), the movant bears the burden of establishing that the transfers in question occurred with the proper intent. *Pavy v. Chastant (In re Chastant),* 873 F.2d 89, 90–91 (5th Cir.1989); *Morton v. Dreyer (In re Dreyer),* 127 B.R. 587, 593 (Bankr. N.D.Tex.1991). In addition, when the Court is applying the doctrine of continuing concealment, the Court must find that the concealments continued into the year before bankruptcy with the requisite intent. *Olivier,* 819 F.2d at 555. The Court does not need to find that the Debtor had the intent to delay *and* hinder *and* defraud. *See Humphries v. Schnurr (In re Schnurr),* 107 B.R. 124, 130 (Bankr.W.D.Tex.1989) ("[A]ll the plaintiff has to prove is that the debtor hindered his creditors, he delayed his creditors, or he defrauded his creditors."); *see also NCNB Texas National Bank v. Bowyer (In re Bowyer),* 916 F.2d 1056, 1059 (5th Cir. 1990) ("[T]he term 'defraud' does not subsume 'hinder or delay.' "), op. on reh., 932 F.2d 1100 (5th Cir.1991).

Before the Court may deny the Debtor's discharge on the basis of intent to defraud, the evidence must show that the Debtor had an *actual* intent to defraud. *Chastant,* 873 F.2d at 91. Actual intent, however, may be established by circumstantial evidence or by inferences drawn from a course of conduct. *Hibernia National Bank v. Perez (In re Perez),* 954 F.2d 1026, 1029 (5th Cir.1992); *Chastant,* 873 F.2d at 91; *Dreyer,* 127 B.R. at 593; *Cullen Center Bank & Trust v. Lightfoot (In re Lightfoot),* 152 B.R. 141, 147 (Bankr.S.D.Tex.1993). As the Fifth Circuit has noted, "[C]ourts have recognized that those who transfer property with such an intent may be reluctant to disclose their motivation, and ... therefore ... have held that the intent to frustrate creditors can be inferred from conduct." *Olivier,* 819 F.2d at 553.

■ Courts have identified the following factors as evidencing the fraudulent intent necessary to deny discharge under § 727(a)(2)(A):

(1) the lack or inadequacy of consideration;

(2) the family, friendship, or close associate relationship between the parties;

(3) the retention of possession, benefit, or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Chastant,* 873 F.2d at 91; *see also Lightfoot,* 152 B.R. at 147 (listing these factors and others). One of these factors is sufficient to find fraudulent intent, but the accumulation of several factors indicates strongly that the debtor possessed the requisite intent. *Lightfoot,* 152 B.R. at 148; *Cook,* 126 B.R. at 269. Application of the above-listed factors to this case indicates that Sullivan had the necessary intent to defraud, hinder, or delay his creditors.

■ *(1) Lack or inadequacy of consideration for the transfers*—Gratuitous transfers of valuable property are presumed to be with fraudulent intent. *Chastant,* 873 F.2d at 91, quoting *National Bank of Pittsburgh v. Butler (In re Butler),* 38 B.R. 884, 888 (Bankr. D.Kan.1984). A gratuitous transfer of a valuable and marketable asset is especially questionable when the debtor makes the transfer during a period of financial distress. *See EFA Acceptance Corp. v. Cadarette (In re Cadarette),* 601 F.2d 648, 651 (2d Cir. 1979). Sullivan transferred the 3.5 acres adjacent to his homestead, the Dino Ferrari, the P–4 Ferrari, and the stock options to the Regent Trusts without any consideration during a period of financial distress. Sullivan did not rebut the presumption that he made the transfers with the necessary intent to delay, hinder, or defraud.

*(2) The family, friendship, or close associate relationship between the parties*—"[A] presumption of actual fraudulent intent necessary to bar a discharge arises when property is ... transferred ... to relatives." *Chastant,* 873 F.2d at 91, quoting *Butler,* 38 B.R. at 888. Sullivan transferred large amounts of cash to his wife Frances, his brother Mark, and his sister Karen within one year of bankruptcy. Moreover, virtually all of the transfers discussed in the Findings of Fact were made to family members or affiliated entities, including the Regent, Korbel, and Sherwood Trusts. Sullivan's brother Mark was trustee for the Regent Trusts, as well as an officer, director, and/or employee of many of the Sullivan-affiliated business entities, including SDC. Also, Sullivan's brother Joe was an officer, director, and/or employee of several Sullivan companies. These and other family members, including Sullivan's wife, played roles in furtherance of Sullivan's efforts to move assets outside the reach of his creditors and are evidence of Sullivan's intent to defraud his creditors.

*(3) The retention of possession, benefit, or use of the property in question*—"The retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer." *Olivier,* 819 F.2d at 553, quoting *Cadarette,* 601 F.2d at 651. Sullivan and his family continued to use the 3.5 acres surrounding their home, and Sullivan continued to drive the Dino Ferrari, as if no transfers to the Regent Trusts had been made. Sullivan continued to pay for the maintenance, repairs, taxes, and utilities related to the transferred property. Sullivan continued to deal with Norwood, the individual who was to build the P-4 Ferrari, as if Sullivan was still the future owner. Sullivan continued to make margin payments on the stock transferred to the Regent Trusts and to the Korbel Trust either directly or through loans to the trusts. Proceeds from the sale of Presidio stock were paid to Sullivan's attorneys for his benefit. Finally, the furniture transferred to Manhattan Beach remained in Sullivan's home or on the grounds surrounding it.

*(4) The financial condition of Sullivan before and after the transactions in question*—Insolvency *per se* need not be shown to prevail in a § 727(a)(2) action. It is not even necessary that a debtor have current financial problems; anticipation of future financial problems is sufficient. *See, e.g., Olivier,* 819 F.2d at 552–53, 555 (denying debtors their discharge, although they had transferred property only in anticipation of an adverse judgment in a personal injury lawsuit). Sullivan began concealing assets from his creditors in late 1986, after he became aware that many of the real estate loans for which he was personally liable would go into default. In addition, Sullivan became involved in litigation with several financial institutions concerning multimillion-dollar claims. When the transactions were made, Sullivan's financial health was in jeopardy, and the prospects of recovery were zero in the short term and even in the long run.

*(5) The existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors*—"[A] series of transfers by a debtor may be innocuous when viewed *in vacuo,* [but] an inference of irregularity arises from a series of such transfers." *Sacklow v. Vecchione (In re Vecchione),* 407 F.Supp. 609, 616 (E.D.N.Y. 1976). On the other hand, the Fifth Circuit has also noted that a certain degree of pre-bankruptcy planning is acceptable, but that "the line between legitimate pre-bankruptcy planning and intent to defraud creditors ... is not clear." *Swift,* 3 F.3d at 931. The bankruptcy court has the primary duty to determine when the planning becomes "too much." *Id.* at 931. This Court finds that Sullivan's conduct goes well beyond innocent pre-bankruptcy planning. He began to develop a strategy for shielding his assets when he first began to suspect that he was facing financial reversal. He began by creating the Regent Trusts and Manhattan Beach. His strategy later included the creation of the Sherwood and Korbel Trusts. Sullivan did not make only a few transfers; he made transfer after transfer to the trusts, Manhattan Beach, and his family members. He also directed transfers between the trusts and other entities, which transfers ultimately helped him accomplish his purpose of shielding his assets from his creditors. He used

the trusts to buy and sell Presidio Oil Co. stock for large amounts of money. He pledged his PUC stock behind the loan on his homestead property to keep it from creditors. This pattern alone illustrates that Sullivan had the intent to delay, defraud, or hinder his creditors.

*(6) The general chronology of the events and transactions under inquiry*—Sullivan began to take action when he feared that there would be a downturn in the real estate market. His efforts to transfer assets out of the reach of his creditors intensified as he saw the decline in the real estate market and as his lenders began to make demands on him. He continued to make transfers even up to the day prior to filing bankruptcy and afterward, as his financial situation deteriorated. This chronology also supports a finding that Sullivan had the requisite fraudulent intent.

In sum, the Court's analysis of the factors described in *Chastant* illustrates that Sullivan intended to defraud *and* delay *and* hinder his creditors when he made the transfers described in the Findings of Fact. In addition, with regard to the transfers occurring more than one year before the Filing Date, the Court finds that Sullivan continued the concealment of the assets that he transferred into the year prior to bankruptcy with the requisite intent.

### Section 727(a)(4): False Oath

Section 727(a)(4) provides that the court must deny the debtor a discharge if the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. 11 U.S.C. § 727(a)(4). "The bankruptcy system relies on a debtor to deal honestly with his creditors by making full, complete, and honest disclosure in his statements and schedules." *Dreyer,* 127 B.R. at 593; *see Beaubouef,* 966 F.2d at 178; *Morris,* 58 B.R. at 427. "A debtor has a paramount duty to carefully consider all questions posed on his schedules and statements of affairs and see that each question is answered completely in all respects." *Dreyer,* 127 B.R. at 593–94; *see also Banc One, Texas, N.A. v. Braymer (In re Braymer),* 126 B.R. 499, 502 (Bankr.N.D.Tex.1991); *Morris,* 58 B.R. at 427. "The debtor must be scrupulous in giving notice of all assets to which others may make a legitimate claim, and may not avoid questions by failing to disclose the asset even though he or she may think it may be theirs to keep." *Braymer,* 126 B.R. at 502, citing *Woodson v. Fireman's Fund Insurance Co. (In re Woodson),* 839 F.2d 610, 616 (9th Cir.1988). The court in *Braymer* elaborated that "[t]he trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the debtor's hands during the period prior to bankruptcy." 126 B.R. at 503. If a debtor is uncertain as to whether certain assets are legally required to be included in his petition, it is his duty to disclose the assets so that any questions may be resolved. *Id.; Dreyer,* 127 B.R. at 597, both citing *Butler v. Ingle (In re Ingle),* 70 B.R. 979, 983 (Bankr.E.D.N.C.1987). Creditors are entitled to judge for themselves what will benefit and what will prejudice them. *Beaubouef,* 966 F.2d at 178, quoting *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984). Additionally, a debtor has an ongoing obligation to disclose all transfers, attempted transfers, unlisted assets, and other relevant information. *Braymer,* 126 B.R. at 503.

The Plaintiffs had the burden of proving that (1) Sullivan made a statement under oath, (2) the statement was false, (3) Sullivan knew that the statement was false, (4) Sullivan made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case. *Beaubouef,* 966 F.2d at 178. The Schedules filed by Sullivan constitute statements under oath within the meaning of § 727(a)(4)(A). *Id.* at 178 n. 2. False oaths sufficient to justify the denial of discharge include "a false statement or omission in the debtor's schedules." *Id.,* citing 4 COLLIER ON BANKRUPTCY ¶ 727.04[1], at 727–59 (15th ed. 1992). "Any omission ... must rise to the level of an intentional and willful defrauding of the creditors." *Morris,* 58 B.R. at 428. The court may find, however, that "the existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive." *Beaubouef,* 966 F.2d at 178. A series of even

innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth. *Morris,* 58 B.R. at 428, citing *Economy Brick Sales, Inc. v. Gonday (In re Gonday),* 27 B.R. 428, 433 (Bankr.M.D.La. 1983). Thus, courts look at the circumstances surrounding the omissions to determine whether they were intentional. *Morris,* 58 B.R. at 428.

The Plaintiffs must also show by a preponderance of the evidence that the false statements and the omissions were material. "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubouef,* 966 F.2d at 178, quoting *Chalik,* 748 F.2d at 618. It does not matter that the debtor did not intend to injure his creditors when he made the false statement. *Id.*

This Court has discussed in detail the numerous omissions and false statements made by Sullivan in his Statements and Schedules. The false statements were made under oath and Sullivan knew they were false. As noted *supra,* unfiled drafts of Sullivan's Schedules and Statement were inconsistent with the filed Schedules and Statement and indicate that Sullivan manipulated his responses to the questions on the Schedules and Statement. In addition, the Court found Sullivan's explanations about his responses to be unreasonable or not credible. The Amended Schedules and Statement were filed long after the Original Schedules and Statement and did not correct many errors in the Original Statement and Schedules. Thus, Sullivan never provided his creditors with the full disclosure they are entitled to under Title 11.

 The Court finds that the false statements and omissions made by Sullivan rise to the level of intentional and willful defrauding of creditors. Moreover, the series of mistakes and omissions constitutes evidence of a pattern of reckless disregard for the truth sufficient for this Court to derive the necessary intent to deceive. To the extent that Sullivan testified that he relied on the advice of his attorneys in making false statements or omitting information, such reli-

ance prevents the Court from denying the discharge only to the extent that the reliance was reasonable and in good faith. *Dreyer,* 127 B.R. at 597. Sullivan was a sophisticated businessman and played an active role in the preparation of his Schedules and Statements. The Court finds that Sullivan's reliance on his attorneys was not reasonable or credible; rather, the Court finds that Sullivan's "reliance" was a conscious effort by Sullivan and at least one attorney to make false oaths. *See id.* at 597–98 (rejecting the debtor's claim that he relied on his attorney in filling out his schedules when the debtor had actively participated in the preparation of the schedules, signed the schedules, and intentionally failed to disclose valuable assets and transactions); *Braymer,* 126 B.R. at 503 (rejecting the testimony of the debtor that her omissions and false statements on her statements and schedules were the result of her reliance on her attorneys, because she was a sophisticated businesswoman whose testimony the court did not find credible). As noted in the Findings of Fact, these false statements and omissions were material. As a result, the Plaintiffs have established by a preponderance of the evidence that Sullivan knowingly and fraudulently made a false oath or account and that the oath or account pertained to a material fact and related materially to the bankruptcy case.

### CONCLUSION

As the Findings of Fact and Conclusions of Law illustrate, Sullivan developed an elaborate scheme by which to defraud his creditors before and at the time of bankruptcy. Mr. Craig was a tax lawyer, and he helped Sullivan devise methods through which he could hide assets through theoretical, make-believe transactions. Then, when Sullivan and Craig actually prepared his bankruptcy schedules, they made a series of misstatements and omissions. For two years, Sullivan remained silent and did not attempt to clear up the omissions or falsehoods by filing amended schedules and statements. Not only did Sullivan delay in clearing up the falsehoods, but when he finally filed Amended Schedules and an Amended Statement he did not clear up all the problems. Messrs. Craig, Wright,[43] and Sullivan knew that they

43. Mr. Wright was the partner of Mr. Craig who specialized in bankruptcy.

were walking a fine line between legal and illegal manipulation of assets. Even if the planning were ostensibly appropriate tax planning, which is an issue that is not relevant here, the planning clearly was not appropriate pre-bankruptcy planning.[44] The Court must hold that Mr. Sullivan shall not receive a discharge.

---

**44.** Nor will the Court condone the *post*-bankruptcy planning done in this case.