In re Larry L. WOMBLE, Debtor.

Pher Partners, Plaintiff,

v.

Larry L. Womble, Defendant.

Bankruptcy No. 01–21469–RLJ–7.
Adversary No. 02–2014.

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

Feb. 5, 2003.

S. Leon Mitchell, Gurley, Mitchell, Gassaway & Jones, Borger, TX, for Plaintiff.

Dennis Olson, Olson, Nicoud, Birne & Gueck, Dallas, TX, for Defendant.

## MEMORANDUM OPINION

ROBERT L. JONES, Bankruptcy Judge.

Before the court is Pher Partners's complaint objecting to the discharge of the debtor, Larry L. Womble (Womble). Pher Partners, a judgment creditor, alleges three primary bases for denial of discharge. First, Pher Partners alleges that Womble's disclaimer of his mother's estate is a sham and a fraud, asserting that Womble retained ownership of the assets of the estate. Womble's ownership of such assets, Pher Partners argues, constitutes a continuing concealment within the meaning of section 727(a)(2)(A). Second, Pher Partners alleges that Womble's transfer of approximately $71,000 on the eve of filing a prior bankruptcy case constitutes a fraudulent transfer of property within the meaning of section 727(a)(2)(A). Third, Pher Partners asserts that Womble's discharge should be denied under section

727(a)(3) for his failure to maintain records in a reasonable and businesslike manner from which his financial condition might be accurately ascertained.

This court has jurisdiction of this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). This Memorandum Opinion contains the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. *Statement of Facts*

### A. **Womble and the Womble Entities**

This is Larry Womble's third bankruptcy filing. He filed this Chapter 7 case on December 11, 2001. His next previous case, a Chapter 13 case, was filed July 10, 2000, after which it was converted to Chapter 11, then to Chapter 12, and ultimately dismissed by the court on November 6, 2001. Womble's first bankruptcy case, a Chapter 11 proceeding, was filed in 1989; it resulted in a confirmed plan.

Womble owns or controls three entities: Womble Land & Cattle Co., Womble Farms, Inc., and a partnership, WW Farms (collectively the "Womble Entities"). Womble Land & Cattle was originally owned by Womble and Roy Record. In 1990, under Womble's confirmed plan in his prior Chapter 11 case, Womble's ownership in Womble Land & Cattle was transferred to Womble Farms, Inc., and Record's ownership interest was transferred to Christi Weaver, Womble's daughter. Stock certificates were never issued to evidence the transfers to Womble and Weaver, however. Womble is the sole owner of Womble Farms, Inc. In the latter part of 1995, Womble Farms, Inc. filed a Chapter 12 case, which resulted in a confirmed plan. WW Farms, the partnership, is owned 70% by Womble Land & Cattle Co. and 30% by Christi Weaver.

As a result, the relationship among Womble, the Womble Entities, and his daughter Christi Weaver, is as follows: Womble owns 100% of Womble Farms, Inc., which in turn owns 50% of Womble Land & Cattle Co., the other 50% owned by Christi Weaver. Womble Land & Cattle Co. owns 70% of WW Farms and Christi Weaver owns the other 30%.

Womble was affiliated with at least two other entities, Four County Tractor & Equipment Co., Inc. (Four County) and Ag Resources, both of which, according to Womble, are no longer viable companies. Similar to Womble Land & Cattle, Womble's interest in Ag Resources, a 50% interest, was conveyed to the generically named "New Corp" under Womble's Chapter 11 plan; the other 50%, originally owed by an individual named Hester, was conveyed to Christi Weaver. Four County filed a prior Chapter 11 case, but it was converted to Chapter 7.

### B. **The Bentley Estate, Womble's Disclaimer, and Pher Partners's Judgment**

Womble's mother, Lucille Bentley, died February 2, 1996, thereby creating the Bentley Estate. Womble was the sole beneficiary under Lucille Bentley's will. In July, 1996, Womble sold Bentley's house for approximately $100,000. Of the proceeds, $52,000 was used to pay an obligation of Womble Farms, Inc., under its confirmed Chapter 12 plan.

On November 1, 1996, Womble executed a partial disclaimer disclaiming any interest in real property under the will of Lucille Bentley. The partial disclaimer specifically states that Womble:

has not accepted any real property as a beneficiary nor taken possession or exercised dominion or control of any real property as a beneficiary. This Disclaimer is an unqualified refusal to ac-

cept any interest in any real property and is irrevocable, and the real property subject hereto shall pass and vest as if the undersigned had predeceased the ... decedent. The sole and only child and heir at law of Lucille Bentley is the undersigned, Larry Leon Womble, and the sole and only child and heir at law of Larry Leon Womble is Christi Womble Weaver (formerly Christi Womble), who is over the age of twenty-one years. *See* Womble Ex. D–15.

Womble is the executor under Lucille Bentley's will, and, for several months prior to her death, managed her assets under a power of attorney. The Bentley Estate is still open and no distribution has been made to Christi Weaver. The Bentley Estate holds 2½ sections of farmland which is being farmed either by the estate or by one of the Womble Entities, in either instance under the direct supervision and control of Larry Womble.

In 1996, Womble had debts in excess of $1 million. In addition, he had guaranteed certain corporate debt. Pher Partners had a judgment for $850,000. Womble testified that his debt structure was about the same in 1996 as it is now.

William J. Lowe, attorney for the Bentley Estate, testified that the Bentley Estate is still open, in part because it is encumbered by large debt to the Federal Land Bank of Houston.

Christi Weaver is the sole beneficiary of the Bentley Estate; she professes little or no knowledge concerning the affairs of the Bentley Estate and the various transactions among the Bentley Estate, Larry Womble, and the Womble Entities.

## C. Transfers and Transactions

The Bentley Estate has received four $15,000 lease payments, apparently for the 2½ sections of farmland, from WW Farms.

The payments were made January 14, 1999, December 16, 1999, December 12, 2000, and December 21, 2001. No written lease agreements, setting forth the terms and conditions of the lease, exist.

In late July and through August, 1999, the Bentley Estate issued several checks, aggregating in excess of $53,000, payable to Womble Land & Cattle, WW Farms, and Womble Farms, Inc. *See* Plaintiff's Ex. 16. Womble testified that these payments constituted loans. No notes were prepared for the loans. Many of the checks contain no notation indicating the purpose of the check. Womble said the loans are notated on a spreadsheet maintained by Womble. This is typical of the way in which Womble handled and managed the affairs of the Bentley Estate.

In 1999, Womble Farms, Inc. transferred a John Deere tractor, valued at $58,000, and a vacuum planter/monitor, valued in excess of $7,000, to the Bentley Estate. Despite this, the Womble Farms, Inc. tax return shows no reduction in depreciable assets for 1999. *See* Plaintiff's Ex. 51. Womble further testified that the use of the two items continued, and still does, as was before the transfer, and he simply keeps track of the hours. Womble explained that the equipment transfer was made in payment of debt owed by Womble Farms, Inc. to the Bentley Estate. There are no promissory notes to evidence such debt, however.

The bank accounts for Womble, the Womble Entities, and the Bentley Estate reflect aggregate gross income for the period of 1996 through 2000 of $1.6 million; the tax returns for Womble, the Womble Entities, and the Bentley Estate for the same period reflects aggregate gross income of $3.5 million. Womble testified that this $1.9 million variance is explained, in part, by the practice of having crop

checks (proceeds) forwarded directly to his lender, Ag Services of America.

An analysis of the bank accounts for Womble, the Womble Entities, the Bentley Estate, and Christi Weaver reflects that, during this time frame (1996 through 2000), Womble Land & Cattle Co. received $135,371, Larry Womble $69,888, and Christi Weaver $2,145. The Bentley Estate, owner of the major assets, received approximately $21,000. Womble Land & Cattle Co. and Larry Womble were therefore the primary beneficiaries of the various transfers and transactions that occurred by and between Womble, the Womble Entities, and the Bentley Estate. Christi Weaver, the beneficiary of the Bentley Estate given Larry Womble's disclaimer, received very little.

On June 3, 2000, Larry and Vivian Womble received a check from "Texas Beef Cattle" in the sum of $71,708.57. They made an immediate $10,000 payment to Womble Land & Cattle Co. for pasture lease. On July 8, 2000, Womble transferred $17,500 to his attorney and $12,500 to WW Farms. With other transfers or payments made by Womble, the Wombles' account balance went from approximately $62,000 on June 3, 2000, to $2,879.55 on July 8, 2000. As noted previously, Womble filed his prior Chapter 13 case on July 10, 2000. In June, 2000, a turnover action had been initiated by Pher Partners against Womble Farms, Inc., Womble Land & Cattle Co., and WW Farms.

In addition to the $12,500 payment on July 8, 2000, from Larry Womble, WW Farms received several other payments from Womble Land & Cattle Co. and Larry Womble in June and July of 2000. Each payment was made at a time when WW Farms's account had been overdrawn. WW Farms received $4,000 from Womble Land & Cattle Co. on June 2, 2000; $3,500 from Womble Land & Cattle Co. on June 5, 2000; $3,000 from Larry Womble on June 15, 2000; $3,000 from Womble Land & Cattle Co. on June 19, 2000; and $5,000 from Womble Land & Cattle Co. on June 26, 2000. Womble's personal ledger reflects that the $12,500 was paid for pasture. The WW Farms's ledger simply categorizes the payment as being derived from Larry Womble. The WW Farms's ledger does, however, categorize the payments from Womble Land & Cattle Co. as pasture payments. *See* Womble's Ex. D–1.

The 1997 K–1 issued by WW Farms, reflecting the partner's share of income, reflects that Womble Land & Cattle received income from the partnership of $118,602. *See* Plaintiff's Ex. 11. In contrast, the 1997 tax return for Womble Land & Cattle reflects income of $86,100, all from sales of agricultural products and custom work. *See* Womble's Ex. D–10.

The 1999 Womble Farms, Inc. tax return does not reflect any ownership by Womble Farms, Inc. in Womble Land & Cattle Co.; it does reflect ownership of stock in Four County Tractor, valued at $191,558. *See* Plaintiff's Ex. 51. Womble testified that there was no basis for the value and that the valuation probably reflects a prior value that had been used.

From 1996 until November 12, 2002, Womble failed to file tax returns for Four County, Womble Farms, Inc., Womble Land & Cattle Co., and WW Farms. Certain returns were filed on November 12, 2002, shortly before trial of this adversary proceeding.

The tax returns filed November 12, 2002, for the years 1996 through 2000 for Womble Land & Cattle Co., WW Farms, and Womble Farms, Inc. reflect that each of these entities has liabilities exceeding their assets.

Womble testified that Ag Resources has been defunct since before 1996. However, Mr. Lowe testified that he had prepared leases for Ag Resources up until "last year." The tax return filed for Ag Resources for 1996, the last return filed, does not show to be a final return.

## II. *Discussion*

### A. Continuing Concealment Under § 727(a)(2)(A)

#### 1. Generally

Pher Partners contends that, despite Womble's disclaimer of the Bentley Estate in 1996, Womble's use of the Bentley Estate property constitutes a continuing concealment within the year preceding his present bankruptcy filing. A debtor will be denied a discharge under section 727(a)(2)(A) of the Code if "the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A) (2002).

■ Womble filed his disclaimer on November 11, 1996—well outside the one-year statutory time frame. However, the Fifth Circuit recognizes the doctrine of continuing concealment. *See Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 554–55 (5th Cir.1987). As explained by the circuit, "the concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy and, therefore, [ ] such concealment is within the reach of section 727(a)(2)(A)." *Id.* at 555.

■ A denial of discharge under section 727(a)(2) consists of two elements: (1) the debtor must have transferred or concealed property; (2) with the intent to hinder, delay, or defraud creditors. *See* 11 U.S.C. § 727(a)(2); *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997); *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir.1993). The creditor objecting to discharge bears the burden of proof on all elements, which he may meet by a preponderance of the evidence. *See* FED. R. BANKR. P. 4005; *FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 938 (Bankr. N.D.Tex.1997) (Abramson, J.); *Hubbell Steel Corp v. Cook (In re Cook)*, 126 B.R. 261, 265 (Bankr.E.D.Tex.1991). Section 727(a)(2) "must be strictly construed against the objector and liberally construed in favor of the [debtor]." *J–W Operating Co. v. Rothrock (In re Rothrock)*, 96 B.R. 666, 670 (Bankr.N.D.Tex. 1988)(McGuire, J.). *Accord Rosen*, 996 F.2d at 1531 ("Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly").

■ Harm to a creditor is not a required element of section 727(a)(2). *See Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000). "Concealment includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *Peterson v. Scott (In the Matter of Scott)*, 172 F.3d 959, 967 (7th Cir.1999), *quoting United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir.1984). For purposes of continuing concealment, it is not the secrecy of a transfer or of a retained interest that matters. *See In re Sullivan*, 204 B.R. at 939; *Cullen Ctr. Bank & Trust v. Lightfoot (In re Lightfoot)*, 152 B.R. 141, 146 (Bankr.S.D.Tex.1993). Rather, "[t]he transfer of title with attendant circumstances indicating that the [debtor] continues to use the property as his own is

sufficient to constitute concealment." *In re Sullivan,* 204 B.R. at 939. As explained by Judge Abramson in *Sullivan,*

> in cases where the plaintiff can prove that the debtor retained control or an equitable interest in the property, the courts have appropriately denied discharge under the theory of continuing concealment. A concealment is accomplished by a transfer of title coupled with the retention of the benefits of ownership. A concealment need not be literally concealed .... Control of property held in the name of another is also an element evidencing a continued interest, especially when assets are transferred to family members or close associates.

*Id.* (internal citations and quotations omitted). Thus, the court may deny discharge under section 727(a)(2) when the debtor fraudulently retains control or an equitable interest in property: "[i]n a situation involving the transfer of title coupled with retention of the benefits of ownership, there may, indeed, be concealment of property." *Rosen,* 996 F.2d at 1532.

Pher Partners urges the court to find that Womble, in spite of his disclaimer, has retained all of the benefits of ownership of the Bentley Estate. In other words, Pher Partners argues that Womble maintains a secret interest in the Bentley Estate, such as would justify a denial of discharge under the continuing concealment doctrine. *See, e.g., id.* Womble, either for himself, the Bentley Estate, or the Womble Entities, effectively manages and controls the assets of the Bentley Estate.

■ The retention of benefits under a secret interest may constitute fraudulent concealment. Nevertheless, as explained by the Third Circuit, "a relevant concealment can occur only if *property of the debtor* is concealed. Thus, it is clear from the statute that the debtor must possess some property interest in order to be barred from discharge on the grounds of a 'continuing concealment.' " *Id.* at 1531 (emphasis in original). A legally relevant concealment can exist only if there is, in fact, some secret interest in property. *See id.* at 1532 (citing cases). The Fifth Circuit explained that:

> Concealment has generally been defined as the transfer of legal title to property to a third party with the retention of a secret interest by the Bankrupt. In effect, this would be creating a trust in the Bankrupt. *However, if the transfer is absolute, even if it defrauds the creditors, the transfer cannot bar discharge.* The court in *Thompson v. Eck,* 149 F.2d 631 (2d Cir.1945), held that a bankrupt must retain some legal interest in property before he can be charged with its concealment and preclude his discharge. The court in the case of *In re Vecchione,* [407 F.Supp. 609 (E.D.N.Y.1976)], clarified this position by indicating that even though the bankrupt had transferred legal title, the fact that he continued to use and thus derive an equitable benefit from the property constituted continuing concealment. Therefore, in cases where the plaintiff can prove that the debtor retained control or an equitable interest in the property, the courts have appropriately denied discharge under the theory of continuing concealment.

*Thibodeaux v. Olivier (In re Olivier),* 819 F.2d 550, 553 n. 4 (5th Cir.1987)(emphasis added). Thus, the debtor must retain control of the property, or some secret legal or equitable interest in the property, before the court may deny discharge under the doctrine of continuing concealment. *See id; Berland v. Mussa (In re Mussa),* 215 B.R. 158, 174 (Bankr.N.D.Ill.1997).

■ "Interest in property is not defined by the bankruptcy code. In the absence of a controlling federal law, interests

in property are a creature of state law." *Simpson v. Penner (In the Matter of Simpson)*, 36 F.3d 450, 452 (5th Cir.1994). The court must therefore look to Texas probate and property law to determine whether Womble maintains an interest in the Bentley Estate. *See id.* Texas law permits a beneficiary to disclaim in part or in whole any inheritance under a will.[1] *See* TEX. PROB. CODE ANN. § 37A (Vernon 2001). Texas law in this area must be given its full effect. *See In the Matter of Simpson*, 36 F.3d at 453. Under Texas law, if a disclaimer is valid, the beneficiary is deemed to have predeceased the testator, meaning that the beneficiary "never gains possession of disclaimed property." *Id.* at 452. Additionally, a disclaimer is irrevocable. *See* TEX. PROB. CODE ANN. § 37A(d). A valid, and therefore irrevocable, disclaimer prevents the intended beneficiary from ever having an interest in the estate property. *See In the Matter of Simpson*, 36 F.3d at 452–53.

If Womble's disclaimer is valid, then, under Texas law, Womble never had a property interest in the Bentley Estate because Texas law would have deemed Womble as predeceasing the testatrix— "the [disclaiming] beneficiary never possesses the disclaimed property." *In the Matter of Simpson*, 36 F.3d at 453. If Womble never had an interest in the Bentley Estate, he could not have concealed "property of the debtor" pre-petition, as there was no such property to conceal. *See* 11 U.S.C. § 727(a)(2)(A); *Rosen*, 996 F.2d at 1532; *In re Olivier*, 819 F.2d at 553 n. 4.

### 2. Disclaimer of Inheritance

■ "No disclaimer shall be effective after the acceptance of the property by the beneficiary. For the purpose of this section, acceptance shall occur only if the person making such disclaimer has previously taken possession or exercised dominion and control of such property in the capacity of beneficiary." TEX. PROB. CODE ANN. § 37A(g). "[T]he principal reason to prohibit disclaimer after acceptance is to protect third parties' interests in transactions with beneficiaries." *Badouh v. Hale*, 22 S.W.3d at 392, 396 (Tex.2000). For example, Texas law permits an expectancy interest to be conveyed or assigned while the testator is alive or dead. *See id.* It would be unjust to permit a beneficiary to disclaim his inheritance after the beneficiary has assigned the inheritance to a third party. *See id.* Thus, prohibiting a disclaimer in such instances prevents injustice and protects third parties because "equity should not allow the expectant to unilaterally renounce a benefit already obtained." *Id.*

■ The Texas Supreme Court, in *Badouh*, held that a disclaimer is invalid only if the actions allegedly constituting the exercise of dominion and control were undertaken by one acting in a beneficiary status. *See id.* As explained by the court, "requiring beneficiary status for acceptance purposes protects the disclaimer rights of those who take possession or exercise control of property in some other capacity." *Id.* Thus, if an individual is entitled to hold bequeathed property in the capacity of an executor, the fact that such an individual exercises control over such property does not necessarily give rise to an inference of acceptance in a beneficiary capacity in the absence of some other conduct "tending to show an intent to claim the property as a beneficiary under the will." *Id.*

---

1. In order for a disclaimer to be valid, it must conform to certain procedural requirements, such as notarizing, filing, and timing. *See*

TEX. PROB. CODE ANN. § 37A. Pher Partners does not allege any procedural deficiencies with respect to Womble's disclaimer.

Texas statutory and case law have yet to adequately define the types of acts that may constitute an exercise of dominion and control over estate property. However, the Texas Legislature amended section 37A in 1979 to harmonize Texas's disclaimer provisions with federal tax law. *See id.* at 396–97. The Texas Supreme Court concluded that "the Internal Revenue Code's qualified disclaimer section is instructive on the issue of what actions qualify as an exercise of dominion and control." *Id.* at 397. The court thus concluded that pledging an expectancy interest will invalidate a disclaimer because the pledging of property to secure a loan is an exercise of dominion and control which, when undertaken in the capacity of a beneficiary, meets the requirements of section 37A(g). *See id., citing* Treas. Reg. § 25.2518–2(d)(4).

Applicable treasury regulations provide that:

> Acceptance is manifested by an affirmative act which is consistent with ownership of the interest in property. Acts indicative of acceptance include using the property or the interest in property; accepting dividends, interest, or rents from the property; and directing others to act with respect to the property or interest in property. However, merely taking delivery of an instrument of title, without more, does not constitute acceptance . . . .

> (2) Fiduciaries. If a beneficiary who disclaims an interest in property is also a fiduciary, actions taken by such person in the exercise of fiduciary powers to preserve or maintain the disclaimed property shall not be treated as an acceptance of such property or any of its benefits. *Under this rule, for example, an executor who is also a beneficiary may direct the harvesting of a crop or the general maintenance of a home.*

Treas. Reg. § 25.2518–2(d) (emphasis added). Thus, under both state and federal law, a beneficiary who disclaims property is not deemed to have accepted such property when the disclaiming beneficiary uses or exercises dominion and control over disclaimed property in the capacity of an executor. *See id. See also Badouh,* 22 S.W.3d at 396; P.L.R. 8439008, 1984 WL 268441 (June 20, 1984) (ruling that a beneficiary/fiduciary may disclaim beneficial interest yet retain fiduciary powers).

Pher Partners alleges that Womble has undertaken numerous actions subsequent to his disclaimer which, Pher Partners argues, invalidate his disclaimer. It is not clear, however, that actions taken subsequent to a validly executed disclaimer may defeat the disclaimer. Texas Probate Code section 37A(g) provides that "acceptance shall occur *only* if the person making such disclaimer has *previously* taken possession or exercised dominion and control . . . ." TEX. PROB. CODE ANN. § 37A(g) (emphasis added). Use of the term "previously" leads to the conclusion that taking possession or exercising dominion and control must occur prior to the disclaimer, and use of the term "only" is limiting in nature: "only" means that acceptance occurs exclusively in the case of taking possession or exercising dominion and control prior to a disclaimer. The court is directed to follow "the literal, plain language of a statute unless doing so would lead to an absurd result." *United States v. Retirement Servs. Group,* 302 F.3d 425, 435 (5th Cir.2002). *Accord Fitzgerald v. Advanced Spine Fixation Sys. Inc.,* 996 S.W.2d 864, 865 (Tex.1999) ("it is cardinal law in Texas that a court construes a statute, first, by looking to the plain and common meaning of the statute's words"). The plain language of section 37A(g) is clear; taking possession, or exercising dominion and control of estate property after recording an otherwise valid

disclaimer will not defeat such disclaimer. TEX. PROB. CODE ANN. § 37A(g). Federal tax regulations are more explicit: "[a] qualified disclaimer cannot be made with respect to an interest in property if the disclaimant has accepted the interest or any of its benefits, expressly or impliedly, *prior to making the disclaimer*." Treas. Reg. § 25.2518–2(d)(1) (emphasis added).

■ "It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate." *Liona Corp. Inc. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir.1991). The temptation exists, therefore, for a court of equity to disregard the form of a disclaimer and to pronounce a disclaimer a sham, when acts taken subsequent to a disclaimer evidence that the disclaiming beneficiary has not, in fact and in substance, truly disclaimed his inheritance. However, an attempt to obtain through equity that which the law forbids is an impermissible exercise of equity: "it is well established that courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 485, 117 S.Ct. 1491, 1501, 137 L.Ed.2d 730 (1997). Section 37A(g) is clear and unambiguous and its dictates must be given full effect. *See In the Matter of Simpson*, 36 F.3d at 453.

■ Thus, if Womble's disclaimer was valid when made, the court cannot conclude that subsequent acts of dominion and control undertaken by Womble in the capacity of a beneficiary may serve to invalidate the disclaimer. *See* TEX. PROB. CODE ANN. § 37A(g). Indeed, those opinions that examine the validity of a disclaimer look to pre-disclaimer actions in deciding whether such actions constitute acceptance of the inheritance. *See, e.g., Estate of Monroe v. Commissioner of Internal Revenue*, 124 F.3d 699, 708 (5th Cir.1997) (holding that gifts made to disclaimants to allegedly induce them to disclaim property "do not change the irrevocability of the disclaimers; once executed, the disclaimers were effective ... even if the disclaimants subsequently received and accepted a payment from Monroe, the Commissioner has not demonstrated how such acceptance affects the enforceability of the previously executed disclaimer"); *Badouh*, 22 S.W.3d at 396.

### 3. Whether Acceptance of Some Disclaimed Property Invalidates Disclaimer In Toto

■ Womble, either as beneficiary or in his capacity as executor, sold Bentley's homestead, with the proceeds used, in part, to pay obligations of Womble Farms under its Chapter 12 plan. This raises the issue whether acceptance of a portion of the estate prior to executing the disclaimer invalidates the disclaimer entirely or just as to the accepted property. This appears to be an issue unaddressed by Texas and the laws of other states as well. *See, e.g., Blackwell v. Lurie (In re Popkin & Stern)*, 223 F.3d 764, 767 n. 9 (8th Cir.2000) (noting that there was a lively debate between the parties as to whether "acceptance of any part of the property covered by a disclaimer renders the entire disclaimer invalid as to all other property covered by it but not accepted," but declining to address this question because of other factors dispositive of the case).

■ The Texas Probate Code states that "[n]o disclaimer shall be effective after the acceptance of the property by the beneficiary." TEX. PROB. CODE ANN. § 37A(g) (Vernon 2000). A beneficiary is, however, permitted to execute a partial disclaimer: "[a]ny person who may be en-

titled to receive any property as a beneficiary may disclaim such property in whole or in part . . . ." *Id.* § 37A(e). If a beneficiary may accept some devised property yet disclaim other such property, it would make little sense to invalidate a disclaimer in its entirety merely because the beneficiary accepted some portion of devised property. Rather, a beneficiary may disclaim any property that he has not previously accepted. *See id.* § 37A(g). This means that a disclaimer executed after the beneficiary has accepted some property is void as to that property. *See id.* It does not follow, however, that the disclaimer is void as to other disclaimed property, because: (1) the disclaimer does not extend to property previously accepted; and (2) to invalidate the disclaimer as a whole in such a case is inconsistent with the beneficiary's right to accept some property and to disclaim other property.

In the present case, Womble's disclaimer states "I, Larry Leon Womble, in accordance with the provisions of Section 37A of the Texas Probate Code, hereby disclaim any and all interest in all real property which I may be entitled to receive from the estate . . . ." Womble, even if deemed to have accepted the homestead as a beneficiary prior to executing the disclaimer, can still disclaim all other real property in the Bentley Estate. *See id.* § 37A(e).

This conclusion is reinforced by federal tax law and regulations. As noted, the Internal Revenue Code's qualified disclaimer section is instructive on the meaning and operation of section 37A. *See Badouh,* 22 S.W.3d at 397. Treasury Regulations state that a "qualified disclaimer cannot be made *with respect to an interest* in property if the disclaimant has accepted *the interest* or any of its benefits . . . prior to making the disclaimer." Treas. Reg. § 25.2518–2(d) (emphasis added). The language of this regulation suggests that, although a disclaimer is ineffective with respect to accepted interests, it may nevertheless be effective with respect to non-accepted interests.

The court concludes that, under Texas probate law, Womble's alleged acceptance as a beneficiary of the Bentley homestead prior to executing the disclaimer does not invalidate the disclaimer as a whole.

Womble's disclaimer is valid. As to the disclaimed property, Womble is deemed to have predeceased the testatrix. He effectively eliminated any interest he may have had in the disclaimed property. It follows, then, that he had no concealed interest, as well.

Additionally, Womble has no interest in the Bentley homestead, as it was sold and the proceeds exhausted well beyond one year of either this or his prior (July 10, 2000) bankruptcy case.

### B. The $71,000 Transfer and § 727(a)(2)(A)

From June 3, 2000 to July 8, 2000, Womble transferred the majority of the $71,708.57 he received from Texas Beef Cattle. Pher Partners alleges that Womble's depletion of the funds in the face of their judgment and turnover motion falls within section 727(a)(2)(A) as a transfer committed with the intent to hinder, delay, or defraud creditors, and accordingly, constitutes an additional basis for denial of discharge. Womble contends the funds were used for legitimate business purposes.

Womble also argues that his depletion of the funds cannot, as a matter of law, fall within section 727(a)(2)(A) because the depletion occurred more than one year prior to the filing of the present bankruptcy. Womble filed the present Chapter 7 case on December 11, 2001. Depletion of the $71,000 occurred more than one year prior

to this date. However, Pher Partners argues that the operative date for purposes of section 727(a)(2)(A) is the filing date of Womble's previous bankruptcy filing, specifically Womble's July 10, 2000 Chapter 13 case. He converted this case first to Chapter 11 on December 5, 2000, and then to Chapter 12 on July 19, 2001. The court dismissed this case on November 6, 2001. If July 10, 2000, is the operative date for purposes of section 727(a)(2)(A), then Womble's depletion of the $71,000 falls within the time limitation of section 727(a)(2)(A).

### 1. Whether the Transfer of $71,000 Occurred Within the One Year Time Frame

 Section 727(a)(2)(A) permits denial of discharge if the debtor has transferred or concealed property, with the requisite intent, "within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A) (2002). " 'Petition' means petition filed under section 301, 302, 303 or 304 of this title, as the case may be, commencing a case under this title." *Id.* § 101(42). The definition of petition suggests that "the date of filing of the petition" refers only to the date of the filing of the current petition, without regard to previously filed petitions. In fact, the only reported case to have considered this issue with respect to section 727(a)(2)(A) has held that the only relevant date is the date of the current petition: "the court is not aware of . . . any provision of the Bankruptcy Code or other applicable nonbankruptcy law which would suspend the relevant time period under section 727(a)(2)(A) while the debtors resided for some eleven months in their first bankruptcy case." *United States Fid. & Guar. Co. v. Hogan (In re Hogan),* 208 B.R. 459, 463 n. 3 (Bankr.E.D.Ark.1997).

However, the Supreme Court has recently held that the three-year lookback period allowing the IRS to collect taxes against a debtor is tolled during the pendency of a prior bankruptcy. *See Young v. United States,* 535 U.S. 43, 122 S.Ct. 1036, 1039, 152 L.Ed.2d 79 (2002). Section 507(a)(8) permits a governmental unit to recover on a claim "for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition." 11 U.S.C. § 507(a)(8)(A)(i). In *Young,* the debtors failed to pay their 1992 federal income taxes, due October 15, 1993. *Young,* 122 S.Ct. at 1038. They filed a Chapter 13 case on May 1, 1996, which they dismissed one day prior to filing a Chapter 7 case, on March 12, 1997. *See id.* The issue before the Court was whether the debtors could discharge their 1992 taxes, given that their first (Chapter 13) filing fell within the three-year lookback period, while their second (Chapter 7) filing fell outside this period. *See id.* The Court held that the first filing tolled the lookback period. *See id.* at 1039.

"The lookback period is a limitations period because it prescribes a period within which certain rights (namely, priority and nondischargeability in bankruptcy) may be enforced . . . . Thus, as petitioners conceded, the lookback period serves the same basic policies furthered by all limitations provisions: repose, elimination of state claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Id.* The debtors argued that the lookback period is a substantive component of the Code, as opposed to a procedural limitations period. *See id.* at 1039–40. The Court rejected this argument: "[i]n the sense in which petitioners use the term, *all* limitations periods are 'substantive': they *define* a subset of claims eligible for certain reme-

dies." *Id.* at 1040 (emphasis in original). Holding that the three-year lookback period is a limitations period, the Court next noted that limitations periods are customarily subject to equitable tolling, unless such tolling would be inconsistent with the statute. *See id.* Finding no statutory block to tolling, the Court stated:

Tolling is in our view appropriate regardless of petitioners' intentions when filing back-to-back Chapter 13 and Chapter 7 petitions—whether the Chapter 13 petition was filed in good faith or solely to run down the lookback period. In either case, the IRS was disabled from protecting its claim during the pendency of the Chapter 13 petition, and this period of disability tolled the three-year lookback period when the Youngs filed their Chapter 7 petition.

*Id.* at 1041.

Both sections 727(a)(2)(A) and 507(a)(8)(A)(i) use the phrase, "before the date of the filing of the petition." 11 U.S.C. §§ 507(a)(8)(A)(i); 727(a)(2)(A). As in *Young,* the one-year lookback period of section 727(a)(2)(A) "prescribes a period within which certain rights . . . may be enforced." *Young,* 122 S.Ct. at 1039. The right in *Young* was dischargeability, while the right contemplated by section 727(a)(2)(A) is discharge. Thus, section 727(a)(2)(A) is a limitations period as contemplated by *Young* because it provides "certainty about a . . . defendant's potential liabilities." *Id.* In other words, section 727(a)(2)(A) limits the right of a creditor to block discharge for acts which occur more than one year prior to filing, while section 727(a)(2)(A) limits the debtor's right—discharge—for acts which occur within one year prior to filing. *See, e.g., Hubbell Steel Corp. v. Cook (In re Cook),* 126 B.R. 261, 266 (Bankr.E.D.Tex.1991) (characterizing section 727(a)(2)(A) as statute of limitations); *Peoples Bank Inc. v. Herron (In re Herron),* 49 B.R. 32, 33 (Bankr.W.D.Ky. 1985) (characterizing section 727(a)(2)(A) as statute of limitations).

In *Young,* the Court noted that the automatic stay initiated by the previous filing prevented the IRS from undertaking actions to collect its debt. *Young,* 122 S.Ct. at 1041. "[T]he IRS was disabled from protecting its claim during the pendency of the Chapter 13 petition, and this period of disability tolled the three-year lookback period when the Youngs filed their Chapter 7 petition." *Id.* Thus, a strong equitable consideration in *Young* justified equitably tolling of the lookback period during the prior case, because it would have been inequitable to penalize the IRS for abiding by the automatic stay while at the same time permitting the debtor to employ the automatic stay as a mechanism for defeating the IRS's claim by making such claim time-barred. *See id.* A similar consideration is present in the case at bar. A creditor may not object to discharge under section 727 in a Chapter 12 or a Chapter 13 bankruptcy. *See* 11 U.S.C. § 103(b) (stating that section 727 applies only to cases brought under Chapter 7). Thus, just as the automatic stay prevented the IRS from collecting on its claim during the pendency of the prior case, so, too, did the filing of a prior Chapter 12 or Chapter 13 case prevent Pher Partners from objecting to Womble's discharge.

By the same token, the Supreme Court recognized the possibility of a loophole created by the Code:

The terms of the lookback period appear to create a loophole: Since the Code does not prohibit back-to-back Chapter 13 and Chapter 7 filings (as long as the debtor did not receive a discharge under Chapter 13, see §§ 727(a)(8), (9)), a debtor can render a tax debt dischargeable by first filing a Chapter 13 petition, then voluntarily dismissing the petition

when the lookback period for the debt has lapsed, and finally refiling under Chapter 7. During the pendency of the Chapter 13 petition, the automatic stay of § 362(a) will prevent the IRS from taking steps to collect the unpaid taxes, and if the Chapter 7 petition is filed after the lookback period has expired, the taxes remaining due will be dischargeable. Petitioners took advantage of this loophole, which, they believe, is permitted by the Bankruptcy Code.

*Young,* 122 S.Ct. at 1039. A similar potentiality exists with respect to section 727(a)(2)(A): the debtor may file a Chapter 13, followed by a dismissal and refiling under Chapter 7 outside the one-year lookback period of section 727(a)(2)(A). As a creditor may not file a section 727 action in a Chapter 12 or Chapter 13 case, a debtor may file a petition under Chapter 12 or Chapter 13 for the sole purpose of allowing the one-year time frame of section 727(a)(2) to expire, followed by a dismissal and a refiling under Chapter 7.

The Supreme Court's *Young* opinion compels the conclusion that the lookback period of section 727(a)(2)(A) is tolled during the pendency of a prior filing. Where a debtor files a prior case, dismisses such case, and files a second case shortly thereafter, for the apparent purpose of escaping the one-year lookback period of section 727(a)(2)(A), it is equitable to toll the lookback period during the pendency of the prior case. Additionally, if the creditor objecting to discharge has similarly objected in the prior case, or failed to object for a reason other than mere delay, it is equitable to toll the lookback period during the prior case.

The Supreme Court indicated in *Young* that the motives underlying the previous filing and previous dismissal are immaterial, in which case tolling the one-year lookback period is appropriate per se. *Young,*

122 S.Ct. at 1041 ("Tolling is in our view appropriate regardless of petitioners' intentions when filing back-to-back Chapter 13 and Chapter 7 petitions—whether the Chapter 13 petition was filed in good faith or solely to run down that lookback period").

The court holds that Womble's previous case tolled the one-year lookback period of section 727(a)(2)(A) and thus considers whether Womble's transfer of the $71,000 was committed with the intent to hinder, delay, or to defraud creditors.

### 2. Intent to Hinder, Delay, or Defraud Creditors

 A discharge may not be denied pursuant to section 727(a)(2) unless the court finds actual intent to hinder, delay, or defraud creditors; constructive intent is insufficient. *See First Tex. Sav. Ass'n Inc. v. Reed (In the Matter of Reed),* 700 F.2d 986, 991 (5th Cir.1983); *Pavy v. Chastant (In the Matter of Chastant),* 873 F.2d 89, 91 (5th Cir.1989).

 "Actual intent, however, may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *In the Matter of Chastant,* 873 F.2d at 91. There must be extrinsic evidence of the statutorily violative intent, whether it is to hinder, to delay, or to defraud creditors. *See United States Trustee v. Robb,* 1999 WL 324655 at *1 (N.D.Tex.1999). Recognizing that actual intent is difficult to prove because the debtor will rarely admit to fraudulent intentions, the courts have outlined several so-called badges of fraud which may evidence an actual intent to defraud. *See In the Matter of Chastant,* 873 F.2d at 91. The Fifth Circuit has listed the following general badges of fraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close

associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Id.* One of these factors may be sufficient to find actual fraudulent intent; an accumulation of several such factors strongly indicates that the debtor possessed the requisite intent. *See FDIC v. Sullivan (In re Sullivan)*, 204 B.R. at 940; *Cullen Center Bank & Trust v. Lightfoot (In re Lightfoot)*, 152 B.R. 141, 148 (Bankr.S.D.Tex. 1993).

With respect to Womble's transfer of the Beef Cattle proceeds, Womble testified that a large portion of the funds were used to pay costs incurred in producing the $71,708.57. For example, he testified that $12,500 was paid to WW Farms for pasture charges for his cattle. He also paid his lawyer $17,500, presumably a retainer for his previous bankruptcy filing. He testified that the $10,000 payment to Womble Land & Cattle immediately upon his receipt of the check was also for pasture lease. Despite his claims, Womble has no written lease agreements to substantiate his claim. He provided no explanation why he made lease payments to both Womble Land & Cattle and WW Farms. Both these entities are effectively controlled and owned by Womble. Womble was in bad financial condition at the time of these payments. Such transfers were made at a time when Pher Partners was seeking recovery on its judgment and immediately before Womble's July 10, 2000, bankruptcy filing.

A transfer of assets by a debtor to a wholly owned corporation, especially when undertaken on the eve of bankruptcy, constitutes a badge of fraud which evidences an actual intent to hinder, delay, or defraud creditors. *See Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir.2002); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1583 (2d Cir.1983). Case law treats "intent to hinder or delay" as an intent to improperly make it more difficult for creditors to reasonably collect on their debts. For example, a debtor who transfers funds on the eve of bankruptcy to newly created bank accounts under a name difficult to connect with the debtor may properly be held to have had the intent to hinder or delay his creditors, as discovering the new bank account has the effect of hindering or delaying the creditor's ability to collect from such account. *See Barclays/American Bus. Credit Inc. v. Adams (In re Adams)*, 31 F.3d 389, 392–94 (6th Cir.1994). A debtor who wholly owns a corporation, and transfers such corporation's collected accounts receivable in which a creditor has a security interest into the corporation's general bank accounts, as opposed to the creditor's bank account from which only the creditor may make withdrawals, as called for by the security agreement, is properly held to have done so with the intent of hindering or delaying the creditor's recovery of such collected accounts receivable. *See id.* Likewise, when a debtor transfers property pre-petition in order to make himself judgment proof, such debtor may have had the actual intent to hinder or to delay his creditor's ability to collect on its claims. *See Cage v. Johnson (In re Johnson)*, 54 B.R. 582, 584 (Bankr.S.D.Tex.1985).

If Womble transferred the $71,000 for a legitimate business purpose, the court may not deny discharge on the

basis of this transfer. *See Moreno v. Ashworth (In the Matter of Moreno)*, 892 F.2d 417, 420–21 (5th Cir.1990) (reversing lower courts which found that debtor's sale of controlling stock in corporation three months prior to bankruptcy in exchange for mostly exempt property in the form of future wages was not undertaken with the intent to hinder, delay, or defraud creditors, because the debtor had legitimate business reasons for the transaction). Factors that the court may look to in determining whether the transfer of the $71,000 was for a legitimate business purpose include: (1) whether the transfer was pursuant to a standard business practice; (2) whether the transfer was an arm's length transaction; (3) whether the debtor transferred the funds fully voluntarily, or whether the situation effectively forced the transfer upon the debtor; and (4) whether the debtor received proper consideration for the transfer. *See id.* at 420. Womble maintained no records that substantiate his claim that the transfer was to pay for grazing rights. The transfer was not arm's length. Womble was in dire financial condition at the time of the transfer. Womble introduced no evidence that he was forced to pay his entities, *e.g.* invoices from such entities to Womble, or bills that such entities had to pay for expenses associated with grazing; and Womble introduced no evidence of consideration, such as an agreement with his entities that he would be permitted to graze the land for a set price.

Womble's transfer of the $71,000 was committed with the requisite intent. Depletion of the $71,000 occurred on the eve of Womble's Chapter 13 filing. In this regard, the transfer was an attempt to fraudulently diminish his personal estate knowing he was about to file for bankruptcy—a classic badge of fraud. *See In re Watman*, 301 F.3d at 8; *WTHW Inv. Builders v. Dias (In re Dias)*, 95 B.R. at

419, 425 (Bankr.N.D.Tex.1988). The transfer of these funds evidence an actual intent to hinder or to delay creditors, as the ability of the creditors to reach these funds is burdened by the need to follow the money trail and to initiate actions against the Womble Entities, as opposed to Womble individually. *See In re Adams*, 31 F.3d at 392–94 (holding that transferring funds to bank accounts to which the creditor did not have direct access, or about which the creditor did not know, evidenced actual intent to hinder or to delay creditor); *In re Johnson*, 54 B.R. at 584 (holding that debtor who transferred funds to make himself judgment proof did so with the actual intent to hinder or delay his creditor's recovery).

That Womble's transfer of these funds was not secret is not dispositive of the issue: lack of secrecy of a transfer is not alone sufficient as a defense to an intent to hinder, delay, or defraud creditors when the badges of fraud strongly evidence an actual intent to defraud. *See In re Watman*, 301 F.3d at 12–13 (reversing bankruptcy court finding that no fraud existed, because bankruptcy court relied too heavily on lack of secrecy and advice of counsel in allegedly fraudulent transfer, and bankruptcy court gave too little weight to the traditional badges of fraud). Furthermore, proof of harm to a creditor as a result of the debtor's actions is not a required element of proof under section 727. *See Smiley v. First Nat'l Bank of Belleville (In the Matter of Smiley)*, 864 F.2d 562, 569 (7th Cir.1989); *Taunt v. Wojtala (In re Wojtala)*, 113 B.R. 332, 336 (Bankr. E.D.Mich.1990) ("it is clear that the Trustee can make his case under § 727(a)(2), regardless of whether a creditor is actually delayed, hindered or defrauded. All that the Trustee must prove is that the debtor intended to hinder, delay or defraud creditors when it transferred property").

## C. Failure to Maintain Adequate Records

Pher Partners argues that Womble has failed to "keep or preserve recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions . . . might be ascertained." [2] Pher Partner's First Amended Complaint for Objection to Discharge ¶ 12. Section 727(a)(3) provides that the court may not grant a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3) (2002).

■■■■ "Section 727(a)(3) is intended to allow creditors and / or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands." *WTHW Inv. Builders v. Dias (In re Dias)*, 95 B.R. 419, 422 (Bankr.N.D.Tex.1988)(Felsenthal, J.). In order to prevail on a section 727(a)(3) action, the creditor must establish: (1) that the debtor failed to keep or preserve books or records; and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *See Beneficial Mortgage Co. v. Craig (In re Craig)*, 140 B.R. 454, 458 (Bankr.N.D.Ohio 1992). The adequacy of the debtor's records must be established on a case by case basis. *See id.; United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr.N.D.Ohio 1990). "Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *In re Trogdon*, 111 B.R. at 658. *Accord Chicago Title Ins. Co. Inc. v. Mart (In re Mart)*, 87 B.R. 206, 210 (Bankr. S.D.Fla.1988).

■■■■ Creditors are entitled to written evidence of the debtor's financial situation and past transactions; maintenance of such records is a prerequisite to a discharge. *See In re Dias*, 95 B.R. at 422. Unless the debtor justifies his failure to keep such records, a discharge should not be granted. *See id.* "The debtor's records need not be perfect, but must be kept in an 'intelligent fashion.' " *Id.* The debtor need not maintain books and records such as would pass muster under generally accepted accounting principles. *See id.* Rather, to meet the requirements of the Code, the records must at least allow for reconstruction of the debtor's financial condition. *See id. See also Union Planters Bank N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir.2002)("The provision requires that debtors produce records that provide enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present"). The court, in determining whether the books and records produced are sufficient to trace the debtor's financial history, "has reasonably wide discretion." *See In re Dias*, 95 B.R. at 422. *Accord Second Nat'l Bank v. Parker (In re Par-*

---

**2.** Pher Partner argues that Womble failed to maintain records in a reasonable and businesslike manner "as required under 11 U.S.C. § 727(a)(5)." Pher Partner's First Amended Complaint for Objection to Discharge ¶ 11. Section 727(a)(5) is inapplicable, as that section deals with the debtor's failure to satisfactorily explain any loss of assets—an issue that is not discussed in Pher Partner's complaint and an issue that was not dealt with at trial. More than likely, therefore, Pher Partner's reference to section 727(a)(5) is a mistake; Pher Partners should have cited to section 727(a)(3).

*ker),* 85 B.R. 384, 388 (Bankr.E.D.Va. 1988).

■■■■ Womble argues that the Womble Entities are not currently in bankruptcy, and that any alleged failure to maintain proper records for such entities cannot, as a matter of law, lead to the conclusion that Womble has failed to maintain adequate records personally. This argument is without merit. First, section 727(a)(3) speaks in terms of a failure to maintain adequate records not only of the debtor's financial condition, but also of his "business transactions." 11 U.S.C. § 727(a)(3) (2002). Second, those courts that have considered section 727(a)(3) in the context of a debtor who owns or controls closely held entities, have concluded that the debtor's failure to keep adequate records for such entities, as well as of the debtor's business dealings with such entities, may constitute a violation of section 727(a)(3). In affirming a denial of discharge on the basis of section 727(a)(3), the Seventh Circuit stated,

Also, the bankruptcy court held that even if the documents that they [debtors] provided had been properly recorded and presented as a statement of their financial transactions, the picture would remain incomplete. After the funds that UPB, among others, lent to the Connors were initially spent, they were further shifted among the various business enterprises. Thus, even assuming that the documents presented to the bankruptcy court constituted a sufficient accounting of the transactions that they record, they do not allow UPB to reconstruct the business transactions between the Connors and their various enterprises.

The Connors argue that because they filed for personal bankruptcy, it is their disbursements that are critical—not those of the casinos or racquet club-and those are shown within the records produced. However, considering the significance of the business entities to the Connors' bankruptcy, as well as the intertwining of personal and business expenses, we find that the Connors' business transactions cannot be fully ascertained without further tracing of the loan proceeds. As the debtors directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor. Moreover, at least one $500,000 loan-from the J.H. Berra Construction Company-is not documented at all. Several other personal loans were deposited into the Connors' checking accounts, but no record exists as to their purpose or terms. We do not find the court's conclusion to be clearly erroneous.

*Union Planters Bank N.A. v. Connors,* 283 F.3d at 900. Similarly, this court denied a discharge to a debtor on the basis of section 727(a)(3) for the debtor's failure to maintain adequate records for the business enterprise which the debtor owned an operated. *See In re Dias,* 95 B.R. at 422–23.

■■■ A debtor's failure to document purported loans and other business transactions with related entities may violate section 727(a)(3). *See Union Planters Bank N.A. v. Connors,* 283 F.3d at 900. In *Union Planters,* the debtors "borrowed, lent, transferred, and spent extremely large sums of money to keep [their] businesses afloat." *Id.* The court said, "[p]roviding the court with a stack of cancelled checks and deposit account statements simply does not meet their burden under § 727; it does not give [creditor] sufficient information to trace their financial history or to reconstruct their transactions." *Id.* This is especially the case when a debtor submits bank statements and cancelled checks for inspection, yet the bank state-

ments fail to adequately identify the source of deposits and the checks fail to adequately identify the reason for payment. *See In the Matter of Juzwiak*, 89 F.3d 424, 428 (7th Cir.1996). The same holds true when the debtor pays personal expenses out of business accounts, or when the debtor pays business expenses out of a personal account, or when the debtor pays one entity's expenses out of an account belonging to a different entity. *See id.* When such a debtor's records lead to a "confusion of assets" between the debtor and his entities, or when the corporate records of the debtor's entities are missing, the debtor has failed to maintain adequate records as mandated by section 727(a)(3). *See Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 594 (Bankr. N.D.Tex.1991) (Akard, J.).

 The debtor's records must demonstrate how the debtor paid his living expenses. *See Union Planters Bank N.A. v. Connors*, 283 F.3d at 900. If the debtor takes funds from his entities to pay such expenses, the debtor must maintain some record of such withdrawals. *See id; In re Dias*, 95 B.R. at 422. If the debtor fails to keep proper ledgers of billings, receipts, expenses, and accounts payable, and instead withdraws "cash from the register to pay household expenses," keeping no records of such withdrawals, the debtor has not maintained an adequate record of his finances. *In re Dias*, 95 B.R. at 422. Furthermore, a debtor's failure to file timely tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records. *See id. See also Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 884–85 (6th Cir. BAP 1999); *Lubman v. Hall (In re Hall)*, 174 B.R. 210, 214 (Bankr.E.D.Va. 1994).

 It is not a defense that the debtor submitted for inspection such items as can-

celled checks, receipts, and banking account statements, when a creditor would not be able to ascertain the debtor's true financial condition from such documents without time consuming and detailed analysis. As explained by the Seventh Circuit, "case law makes clear that neither the court nor a creditor is required to reconstruct a debtor's financial situation by sifting through a morass of checks and bank statements." *Union Planters Bank N.A. v. Connors*, 283 F.3d at 899. *Accord In re Dias*, 95 B.R. at 423 ("a creditor should not have to review a voluminous amount of documentation to compile summary records. Since the debtor obtains the 'fresh start' with a discharge of debts, the debtor has the burden under § 727(a)(3) to maintain and produce adequate financial records. To hold otherwise would encourage the retention of voluminous receipts (in lieu of ledger books) to thwart creditors from determining the financial condition of the debtor").

 Womble failed to maintain adequate records as contemplated by section 727(a)(3). Womble had the burden to prove that his failure to maintain such records was justified under all of the circumstances of the case. For example, if the debtor's entities transact only a nominal amount of business, and do not have complicated transactions between themselves or with the debtor, the debtor may be justified in maintaining only bank accounts, cancelled checks, and the like. *See In the Matter of Juzwiak*, 89 F.3d at 428. However, the demands of operating a business do not excuse a debtor from keeping basic financial records. *See In re Dias*, 95 B.R. at 422. The fact that the debtor transacts business with one or more small closely held entities—a situation which frequently leads to a failure to maintain adequate business records—is no defense: adequate business records must nevertheless

be kept even though business transactions are not at arm's length. *See, e.g., Novak v. Blonder (In re Blonder)*, 258 B.R. 534, 539 (Bankr.D.Conn.2001) (denying discharge on the basis of section 727(a)(3) to debtor who, "both individually and through a myriad of interrelated corporations he owned and controlled, was engaged in the businesses of buying and selling high-end antiques and collectibles"). However, the principle that the closeness of the entity to the debtor does not normally relieve the debtor of the burden of maintaining adequate records is subject to the general rule that adequacy of records is measured by considerations including "debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *In re Trogdon*, 111 B.R. at 658. *Accord In re Mart*, 87 B.R. at 210.

 Womble failed to maintain any written records of the loans and leases which he asserts were made between the Bentley Estate and the Womble Entities. Womble failed to introduce any lease agreements or invoices from one entity to another to substantiate numerous transfers between the entities. For five years Womble failed to file tax returns for his entities. Womble took money from his entities without records explaining why such money was taken. Womble presented his creditors and the court with voluminous bank statements and documents, and then expected the creditors and the court to sift through such documents to discern Womble's financial condition and business transactions.

In short, Womble presented the court with spaghetti—numerous transactions going in all directions, all intertwined between Womble, the Bentley Estate, and the Womble Entities, with no meaningful paper trail, and with nothing more than Womble's after-the-fact explanation of what any particular transaction or transfer represented. The Code demands more of a debtor in Womble's circumstance; Womble's self-serving testimony lacks credibility. Womble failed to maintain proper records and documents from which his true financial condition and business transactions might be ascertained. Womble is not unsophisticated: he attended college; he ran several businesses for a number of years; he has been in bankruptcy several times before and therefore knows what is expected of him; and he employed able attorneys to advise him. Womble offered no justification for his failure to keep adequate records and documents.

## D. Womble's Credibility

The court found Womble's testimony to be, in large part, conclusory, self-serving, and unconvincing. In evaluating Womble's credibility, the court was influenced by many factors: Womble's multiple bankruptcy filings; his establishment of and maintenance of control over multiple entities; his failure to maintain records and documentation concerning the various and sundry business affairs and transactions by and between him, the Bentley Estate, and the Womble Entities; his disclaimer of his mother's estate to avoid subjection to creditors of his expected inheritance; prior to the disclaimer, the sale of his mother's homestead and use of a large portion of the proceeds to cover the Chapter 12 bills of Womble Farms, Inc., of which he was (and is) the sole owner; since the disclaimer, his control of the Bentley Estate in a manner that has personally benefitted him; his failure to file tax returns for five years; the apparent omissions and inaccuracies in the filed tax returns; his depletion of the $71,000 on the eve of bankruptcy while, at the same time, effecting transfers of funds

to WW Farms to cover its overdrawn account.

While any one of these factors taken alone may not constitute grounds for denial of discharge, their cumulative effect lead the court to conclude that Womble had the requisite intent to hinder, delay, or defraud his creditors.

### III. Conclusion

The court concludes that Womble's disclaimer and subsequent use of the Bentley Estate does not constitute a continuing concealment under section 727(a)(2)(A). The court does, however, find that Womble's depletion of the approximately $71,000 immediately before his prior bankruptcy filing does constitute a transfer within the requisite time and with the intent to hinder, delay, or defraud his creditors. In addition, the court holds that Womble failed to keep adequate records from which his financial condition or business transactions can be ascertained, and that such failure justifies denial of discharge under section 727(a)(3).